# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

MARY BECKER,                                          :            CIVIL ACTION NO.
Individually and as Permanent          :            2:09-CV-00047-RWS-JCF
Administrator of the Estate of            :
JASON HEWITT ARMSDEN,              :
                                                                :
          Plaintiff,                                      :
                                                                :
v.                                                             :
                                                                :
FANNIN COUNTY, GEORGIA,             :            PRISONER CIVIL RIGHTS
GEORGE ENSLEY, DANE                    :            42 U.S.C. § 1983
KIRBY, GREGORY A. NEWMAN,       :
CAROL DAVENPORT, ROGER           :
PULLIAM, JILLIAN BAILEY,             :
JOE RAPER, MITCHELL MASON,      :
JANELLA VERNER, EARL                  :
LAMAR MASHBURN, HOLLY            :
PHILLIPS, CHAD ENSLEY, JOHN      :
ARP, LARRY DAVENPORT,               :
MARC WHITE, ZEKE WATKINS,       :
RANDY EPPERSON, GAYLE             :
MERCER, and GEORGIA                    :
MOUNTAINS HEALTH                       :
SERVICES, INC.                                 :
                                                                :
          Defendants.                                 :

## MAGISTRATE JUDGE'S NON-FINAL
## REPORT AND RECOMMENDATION

This matter invites consideration of a harrowing four-night stay in the

Fannin County Jail which left Plaintiff's Decedent, Jason Armsden, dead.

Ultimately, this case highlights why for decades the law has recognized that

officials may not hold a person in custody who is suffering from acute alcohol withdrawal without taking some steps to address that condition.  Ignoring the warning signs of this well-recognized condition can turn a relatively minor violation into a capital offense.

Plaintiff, Mary Becker, is the permanent administrator of the estate of her brother, Jason Armsden, who died on April 10, 2007 while a pretrial detainee at the Fannin County Jail ("the Jail").  (Doc. 208 (Pl.'s 4th Am. Compl.) at 1-2, 5).  Plaintiff alleges that the following Defendants are liable for her brother's death: (1) Fannin County ("FC"); (2) the current and former FC Sheriffs, Dane Kirby (in his official capacity only) and George Ensley; (3) the FC Chief Jailer, Captain Greg Newman; (4) four Jail Shift Supervisors, Sergeants Carol Davenport, Jillian Bailey, Janella Verner, and Holly Phillips; (5) six Jail Detention Officers, Roger Pulliam, Mitchell Mason, Joe Raper, Earl Mashburn, John Arp, and Chad Ensley; (6) two FC Sheriff's Road Deputies, Marc White and Larry Davenport; (7) two FC Emergency Medical Technicians, Zeke Watkins and Randy Epperson ("the EMT Defendants"); and (8) nurse practitioner Gayle Mercer, ("the Nurse") and her employer, Georgia Mountains Health Services, Inc. ("GMHS"), who provided inmate medical services at the Jail.  (*Id.* at 1).

Plaintiff's general theory of liability is that, while detained at the Fannin County Jail, Armsden failed to receive adequate medical care for his symptoms of

alcohol withdrawal from Defendants and that this failure caused Armsden's death. Her Fourth Amended Complaint sets forth six counts. Count One asserts Eighth and/or Fourteenth Amendment claims against all Defendants (excluding Gayle Mercer and GMHS) for deliberate indifference to Armsden's serious medical needs. (Doc. 208 at ¶ 93). Count Two seeks punitive damages under state and federal law against all Defendants in their individual capacity. (*Id.* at ¶ 94). Count Three asserts wrongful death claims against all Defendants under Georgia law, the Federal Tort Claims Act, and 42 U.S.C. 1983. (*Id.* at ¶¶ 97-99). Count Four seeks attorney's fees and costs pursuant to 42 U.S.C. 1988 from all Defendants (excluding Gayle Mercer and GMHS). (*Id.* at ¶ 100). Count Five asserts negligent or intentional failure to provide medical care under O.C.G.A. § 42-5-2 against the Fannin County Defendants, including former Sheriff Ensley (based on respondeat superior). (*Id.* at ¶¶ 101-103). Finally, Count Six alleges a breach of the medical standard of care by Nurse Mercer and GMHS. (*Id.* at ¶¶ 104-105).

Defendants Epperson and Watkins have filed a motion for summary judgment (Doc. 248) with supporting brief (Doc. 248-2), statement of undisputed material facts (Doc. 248-1) and exhibits (Docs. 248-3 through 248-5). The rest of the Defendants, with the exception of Defendant Mercer and her employer, GMHS, also filed a motion for summary judgment (Doc. 250), with 8 supporting

briefs (Docs. 250-5 through 250-12)[1], a statement of undisputed material facts (Doc. 250-4), and supporting exhibits (Docs. 250-1 through 250-3).

## I.   **The Factual Background**

The facts underlying Plaintiff's claims and Defendants' motions are taken from the following documents: the EMT Defendants' Statement of Material Facts ("SMF") not in dispute (Doc. 248-1); the SMF not in dispute filed by the following sixteen Defendants—Fannin County; Sheriffs Kirby and Ensley; Captain Newman; Sergeants Davenport, Bailey, Verner, and Phillips; Detention Officers Pulliam, Mason, Raper, Mashburn, Ensley, and Arp; and Sheriff's Deputies Davenport and White—(the "Fannin County Defendants" or "the FC Defendants") (Doc. 250-4); Plaintiff's response to the FC Defendants' SMF (Doc. 264) and to the EMT Defendants' SMF (Doc. 265); Plaintiff's SMF in dispute (Doc. 266); the responses to Plaintiff's SMF in dispute from the EMT Defendants (Doc. 291) and the FC Defendants (Doc. 297); and the exhibits and deposition transcripts filed by the parties (Docs. 148-1, 248-3, 248-4, 248-5, 267, 301 (exhibits), and Docs. 257, 259, 268, 270-288, 290 (deposition transcripts)).

### A.   **Background Concerning The Jail, Jailers, And Sheriff's Office**

---

[1] The briefs are as follows: Fannin County and Sheriff Kirby (Doc. 250-5); former Sheriff George Ensley and Captain Newman (Doc. 250-6); Bailey, Raper, and Mason (Doc. 250-7); Carol Davenport (Doc. 250-8); Roger Pulliam (Doc. 250-9); Phillips, Arp, and Chad Ensley (Doc. 250-10); Verner and Mashburn (Doc. 250-11); and Larry Davenport and White (Doc. 250-12).

4

Sheriff Kirby became the Fannin County Sheriff on January 1, 2009, replacing Sheriff Ensley, who had served 16 years in that position. Sheriff Ensley had delegated to Captain Newman primary responsibility for Jail administration. No Jail inmate had suffered permanent harm from alcohol withdrawal before Armsden died. Except for recent hires Mason and Arp, all Jail supervisors and officers had completed the 80-hour Georgia P.O.S.T. jailer training, which in some cases included basic information about typical symptoms of drug and alcohol withdrawal, but prior to Armsden's death the Fannin County Sheriff's Office ("the FCSO") had provided no other training to Jail personnel about what to do if they suspected that a detainee was experiencing the *delirium tremens*, or "DTs." (Doc. 250-4 ¶ 341). Procedures required an outgoing shift supervisor to pass along important information about Jail and inmate conditions to the incoming supervisor, although Plaintiff and the FC Defendants dispute whether those procedures were formal requirements of Jail policy or merely an informal practice.

The normal booking procedure at the Jail included the completion of a computerized medical screening form, which was to be provided to the nursing staff, but no such form was completed for Armsden. (*See* Doc. 264 ¶ 347). A new inmate was often kept in a holding cell at the discretion of the booking officer.

Sheriff Ensley, on behalf of the FCSO, had contracted with GMHS to provide inmate medical services at the Jail. Nurse practitioner Gayle Mercer was

the primary liaison between the Jail and the Sheriff's Office; she visited the Jail three times per week and was on-call 24 hours a day.  (*See* Doc. 275 (hereinafter Mercer Dep.) at 19, 43, 46).  Jail officers were instructed to contact Mercer and not emergency medical services unless there was an obvious medical emergency.[2] (Doc. 250-4 ¶ 374).  Medical request forms were available to inmates, and detention officers often filled them out for detainees, but there was no official requirement that the forms be faxed to the nurse, who collected the request forms when she came to the Jail on her scheduled thrice weekly visits and was supposed to respond to the requests.

### B.     Armsden's Arrest:  Friday April 6

Sgt. Davenport worked as a shift supervisor for the 7 p.m. to 7 a.m. shifts on Friday April 6, 2007 to Saturday April 7; Saturday April 7 to Sunday April 8; and Sunday April 8 to Monday April 9.  Detention Officer Pulliam, now deceased[3], worked with Davenport during those shifts.

On April 6, 2007, Deputy White observed Armsden drinking and driving in a hospital parking lot and arrested him at approximately 9:44 p.m. for driving

---

[2] Plaintiff disputes this assertion by the FC Defendants, which they base on Captain Newman's deposition testimony, by asserting that Newman in fact discouraged Jail Officers from calling the Nurse.  (*See* Doc. 264 ¶ 374).

[3] Before he died, Defendant Pulliam "had a memory-destroying disease that made a deposition valueless," but he gave an oral statement to the GBI on April 10, 2007.  (*See* Doc. 250-9 at 2-3 and n.3).

while intoxicated.  White then drove Plaintiff to the Jail.  White assisted Armsden into the Jail by holding his arm because Armsden was so intoxicated he could not walk without support.  Sgt. Carol Davenport observed that "he was essentially carried, stumbling in" due to being heavily intoxicated.  (Doc. 288 (hereinafter C. Davenport Dep.) at 37-38).  White waited for a State Patrol officer to perform the alcohol test on Armsden, but Armsden was too drowsy and refused to get up, at which time White returned to his patrol duties.

Armsden was too intoxicated to cooperate with the booking process.  (C. Davenport Dep. at 38).  No one, including Sgt. Davenport, completed a medical screening for Armsden, or completed required documentation concerning such screening (*see* Doc. 267-16 at No. 9, 10, 11), even though Jail policy required that a detainee who is "seriously intoxicated," be medically screened and/or treated before admission into jail.  (*See* Doc. 250-4 at ¶ 28).  Sgt. Davenport asked Deputy White, the arresting officer, and Deputy Larry Davenport, her husband, to take Armsden to the hospital, but they refused.  (C. Davenport Dep. at 28).  According to Sgt. Davenport, her husband also told her she could not take Armsden to the hospital herself or call the EMTs.  (*Id.* at 29).  Sgt. Davenport was afraid to call the nurse that night because the nurse had complained to Captain Newman about Sgt. Davenport doing so, and Captain Newman "told [her] not to bother [the nurse]." (*Id.* at 35-36).  Armsden was then placed in an isolation cell, or holding cell, to

"keep a closer eye on him" in the event he had any medical issues since Sgt. Davenport was unable to obtain a medical clearance for him.[4]  (*Id.* at 38-39).

## C.   Day Shift:  Saturday April 7

Sgt. Jillian Bailey worked as a shift supervisor for the 7 a.m. to 7 p.m. shifts on Saturday and Sunday; Detention Officers Raper and Mason worked with her during those shifts.  On Saturday morning, as Sgt. Davenport's shift was ending, she told Sgt. Bailey and Raper that Armsden had come in the night before extremely intoxicated and had not been medically cleared, and she told them that "we might need to call the nurse" because Armsden was "not acting right."  (C. Davenport Dep. at 63-64; (Doc. 277 (hereinafter Raper Dep.) at 16-17).  When Mason began his shift Saturday morning (at 6 a.m.), he immediately went up to the "tower," and he received no information about Armsden.  (Mason Dep. at 15-19).  After Raper learned about Armsden's condition from Sgt. Davenport Saturday morning, he went to check on Armsden in the holding cell; Armsden told Raper that he was cold, so Raper brought him two additional blankets.  (Raper Dep. at 17).  Raper checked on him later in the day, and he said he was still cold, so Raper brought him another blanket.  (*Id.* at 18).

---

[4] Raper also explained that the jailers often keep heavily intoxicated inmates in the holding cell, as opposed to general population, for two to three days if they do not bond out to avoid having confrontations with other inmates while they are under the influence.  (Raper Dep. at 28-29; *see also* C. Davenport Dep. at 38-39).

Raper told Sgt. Bailey that Armsden was "freezing to death," and she instructed him to call the nurse and Captain Newman, and Raper decided to let Mason make those calls "because he needs to learn how to do it."  (*Id.* at 19-20). Raper told Mason to call the nurse and to call Captain Newman and tell him "what's going on, that [Raper] thought this guy had the flu and he was cold" even though Raper had given him three blankets.  (*Id.* at 18).  Raper heard Mason call the Captain between 7:30 and 8 a.m., and heard Mason tell Captain Newman that Armsden "was freezing to death, he didn't know what was wrong with him."  (*Id.* at 18-20).   According to Raper, Mason told him that Captain Newman had "instructed him that we was right to call the nurse," but not to "call the EMTs unless it's absolutely necessary, which he's told us all that."  (*Id.* at 19-20).  Raper then assumes that Mason did so because Mason "was dialing the phone" as Raper left the area.  (*Id.* at 18-19).  According to Raper, Mason later told him that he "did get a hold of the nurse and the nurse . . . asked was [Armsden] the one they brought in last night drunk from out of the hospital,"[5] and "said he's probably having DTs and there ain't much we can do about that."  (*Id.* at 20).  Raper also testified that Mason told him that the nurse said she "would be over later to see [Armsden]."  (*Id.* at 20-21).  The other accounts differ -- Mason could not recall discussing

---

[5] Raper testified he "really didn't know where [Armsden] was at when they caught him."  (Raper Dep. at 20).

Armsden with Raper (Mason Dep. at 21), while Nurse Mercer denies that anyone called her.  (*See* Mercer Dep. at 109-10).  Both Mason and Raper told Sgt. Bailey that the nurse had said that she was coming that Saturday and that Armsden was possibly suffering from DTs.  (Raper Dep. at 21).

At around 4:00 p.m. Saturday afternoon, Mason served Armsden dinner; this was the only time Mason saw Armsden.  (Mason Dep. at 18-19).  According to Mason, Armsden appeared "hung over," and when Armsden received his food, he told Mason that he could not "eat this solid food," and asked if they had anything like canned peaches.  (*Id.* at 19).  Mason told Sgt. Bailey this information, and she in turn said "[w]ell, he's hung over drunk.  He'll be fine."  (*Id.* at 19-20).  Raper talked to Armsden in the afternoon and asked him if he was still cold, and Armsden responded, "Yes, a little bit, but not as bad as I was."  (Raper Dep. at 26).  According to Raper, Armsden appeared clear-headed and was able to have a conversation with him and was not acting "bizarre or strange."  (*Id.*).  By 7 p.m. i.e., the end of the Saturday day shift, the nurse had not come to examine Armsden.  (*Id.* at 20-21).

### D.    Night Shift:  Saturday April 7 To Sunday April 8

When Sgt. Davenport began her shift that Saturday night, Armsden was still in the holding cell (C. Davenport Dep. at 39), and Raper told her that the nurse had not come to the jail (Raper Dep. at 26).  According to the GBI statement given by

Pulliam on April 10, 2007, on Saturday night Pulliam noticed Armsden lying on the floor of his cell shaking and refusing to eat.  (*See* Doc. 267-14).   Sgt. Davenport denies that Pulliam informed her of those observations.  (C. Davenport Dep. at 16).  There is no evidence that Sgt. Davenport or Pulliam called the nurse or EMTs or attempted to obtain medical care for Armsden during the Saturday night shift.

### E.   Day Shift:  Sunday April 8

Armsden was still in the holding cell on Sunday morning.  (Raper Dep. at 29).  Mason arrived for duty Sunday morning at 6 a.m., and he does not recall being given any information about Armsden when he came in that day.  (Mason Dep. at 20-21, 28).  When Raper arrived, he asked Sgt. Davenport, whose shift was ending, if the nurse had come, and Davenport told him that she had not, so Raper said that they would "try to get a hold of her again today and find out what she needs us to do."  (Raper Dep. at 29).  Raper instructed Mason to call the nurse, and according to Raper, Mason called the nurse and told Raper[6] that "she told him that she would be over there directly, it might be after church, but she would be over there."  (*Id.* at 29).  Mason has no recollection of conversing with or observing Armsden that Sunday.  (Mason Dep. at 22-23).

---

[6] Raper did not observe Mason calling the nurse.  (Raper Dep. at 29-30).

By Sunday afternoon, Raper noticed that "all [Armsden] was doing was laying, he wasn't getting up or nothing," and that "he hadn't ate nothing yet." (Raper Dep. at 31).   Raper asked Armsden how he was doing, and Armsden responded, "Except for being cold, I'm okay." (*Id.* at 33).   Raper suggested to Sgt. Bailey that they call the EMTs about Armsden's condition, but Sgt. Bailey told him "we better not because [Newman] would have a heart attack." (*Id.* at 31).   No one called the EMTs, and as of 7 p.m. Sunday when their shift ended, the nurse had not come to see Armsden. (*Id.* at 30-32).

### F.   Night Shift:  Sunday April 8 To Monday April 9

Raper testified that when Sgt. Davenport began her shift Sunday night, she told Raper she would try to contact the nurse, and Raper told her that he did not "get a hold of the nurse," and that she "probably need[ed] to call EMTs" because Armsden was not eating and was not getting up. (*Id.* at 31-32).   That night Pulliam finally got Armsden to eat something, and he changed Armsden's bed cover. (Doc. 267-14).   At that time, Pulliam noticed blood in Armsden's cell, including "bloody blankets" which he changed, but he could not identify the source; he saw no injuries on Armsden other than a sore on his arm. (*Id.*).   Sgt. Davenport denied at her deposition that Pulliam reported these observations to her. (C. Davenport Dep. at 16-17).   At some point between Sunday evening and Monday morning,

Pulliam and Davenport tried to get Armsden to take a shower, but he was too weak to do so. (Doc. 267-17 at 1).

At approximately 1:30 a.m. Monday morning, Ronnie Davis, an inmate, was placed in the hallway just outside Armsden's cell while he waited to bond out. (Doc. 270 (hereinafter Davis Dep.) at 23-25). Davis could hear Armsden yelling, "Please, I need a drink. Get somebody to give me a drink … Let me out, I need a drink." (*Id.* at 28). Around 3:30 a.m., Pulliam opened Armsden's cell door to let Davis use the bathroom in the cell, and Armsden ran out of the cell, but he was easily subdued after Pulliam "tackled" him. (*Id.* at 28-30, 37; Doc. 267-14). According to Pulliam, Armsden did not say anything after the incident occurred – he simply laid back down on his mat. (Doc. 267-14). Davis, on the other hand, testified that, as Pulliam returned Armsden to his cell, Armsden "kept on hollering and screaming wanting a drink, please, somebody give me a drink." (Davis Dep. at 31). Davis also testified that Armsden was bleeding heavily from his mouth and nose. (*Id.* at 31, 33-34). According to Davis, Pulliam told Armsden "If you don't shut the fuck up, I'm going to whip your fucking ass." (*Id.* at 31). Davis also described Armsden as pale and sweating, and he observed that Armsden appeared to be "so drunk he didn't even know he was in jail." (*Id.* at 32, 58-59; Davis Aff., Doc. 267-18 ¶ 4). He also observed Armsden "shaking all over like he was going in DT's," an observation based on his experience with an alcoholic relative.

13

(Davis Dep. at 38-40).   Davis observed Armsden shaking and yelling that he wanted something to drink throughout the time he was in the cell with Armsden, until he was moved out of Armsden's cell later than morning around 9 or 10 a.m. (*Id.* at 35-37, 43).[7]

After the so-called "escape attempt," Sgt. Davenport completed a Medical Request Form on Monday morning in which she indicated the medical problem was "detox? Dt's."  (Doc. 288-1 at 11).  Sgt. Davenport filled out the request form because she "thought a nurse should check [Armsden] out."  (C. Davenport Dep. at 33).  Davenport also prepared an Incident Report, which stated in relevant part:

> Subject has been experiencing possible DT's since arrest.  Earlier this date, D/O Pulliam and I checked subject, attempting to get subject to shower.   Subject appeared too weak.   Subject was provided with sandwich & milk, as he has not been eating  meals.   He managed to keep down food, then went back to sleep.  We kept periodic checks on him.

(Doc. 288-1 at 6).   Sgt. Davenport further wrote that, after officers subdued Armsden when he attempted to escape, Armsden "appeared disoriented, asking 'where am I?' and 'why am I here?' "  (*Id.* at 8).

From Friday night through Monday morning, no medical professional ever examined Armsden, and no Jail Officer Defendant who worked during that

---

[7] Davis did not report his observations to the jailers, or have any conversations with the jailers about Armsden.  (Davis Dep. at 45, 54).

period—i.e., Sgt. Davenport, Sgt. Bailey, Pulliam, Raper, and Mason—called a doctor or nurse or requested emergency medical services for Armsden.

**G.    Day Shift:  Monday April 9**

Sgt. Verner was the shift supervisor for the 7 a.m. to 7 p.m. day shifts on Monday April 9, and Tuesday April 10; Detention Officer Mashburn also worked at the Jail during those shifts.  Policy required Sgt. Davenport to tell Sgt. Verner about events that happened during her shift, and Sgt. Davenport's "normal procedure" was to pass to Sgt. Verner information included in incident reports, such as the information Sgt. Davenport included in her incident report concerning Armsden.  (C. Davenport Dep. at 58-50; Doc. 280 (hereinafter Newman Dep.) at 18).  In addition, Sheriff Ensley testified that the medical request form that Sgt. Davenport had completed concerning Armsden's DTs should have been given to Sgt. Verner to be faxed to the nurse's office by 9:00 a.m.[8] and then placed in Armsden's file in the booking area.[9]  (Doc. 271 (hereinafter Ensley Dep.) at 48-50).  Sgt. Verner testified that she does not remember seeing a medical request

---

[8] Sgt. Verner disputes that testimony, however, and testified that the medical request forms were simply provided to the nurse when she came to the Jail by placing them in a box, and only faxed to the nurse if the nurse requested them to do so.  (Verner Dep. at 19, 25).

[9] It is unclear whether the medical request form was ever provided to Mercer; Mercer denies that she ever received it, and she denies that anyone ever requested that she see Armsden.  (*See* Doc. 290 (hereinafter Mercer Dep.) at 78, 102, 104-06, 121).

form and does not remember if Sgt. Davenport told her about the medical request form.  (Doc. 279 (hereinafter Verner Dep.) at 19-20).   Verner also does not remember if Sgt. Davenport told her that Armsden was suffering DTs, but alleges that either Sgt. Davenport or Pulliam told her that Armsden, who was still in a holding cell, was still intoxicated.  (*Id.* at 11-12).  Therefore, Sgt. Verner arranged for someone to check on Armsden every 10 to 15 minutes, and she checked on him herself throughout the Monday day shift.  (*Id.* at 12, 15).

Mashburn does not recall receiving any information about Armsden from the previous shift officers, he did not review any incident reports, and Armsden was not on a "special watch" when Mashburn's shift began on Monday.  (Doc. 275 (hereinafter Mashburn Dep.) 10-13, 19-20).  If Armsden was being held in the holding cell for medical reasons, Mashburn was not made aware of that fact.  (*Id.* at 19).

On Monday morning, Mashburn and Sgt. Verner helped bring Armsden from his cell to an interview room so he could be interviewed by investigators about a possible burglary.[10]  (*See* Verner Dep. at 15-17; Mashburn Dep. at 13-14;

---

[10] Investigator Panter testified that Armsden appeared mentally competent and "was speaking with [Panter] fine.  He told [Panter] he understood his rights." (Doc. 286 (hereinafter Panter Dep.) at 32).  According to contemporaneous notes prepared by Sgt. Turner, an investigator who also attended the Armsden interview, Armsden stated that he had tried to escape the night before "because they said something about a military court."  (Doc. 267-22 at 3).  Armsden provided

Doc. 267-26).  Sgt. Verner described Armsden as pale, "[a] little bit disoriented," confused ("[l]ike a little kid needs direction on which way to go confused"), and unsteady on his feet so Sgt. Verner had to hold him by his arm.  (Verner Dep. at 15-16, 18, 23).  Sgt. Verner testified that she knows DTs are a sign of alcohol withdrawal, and that symptoms include shaking, mood swings, and sweating.  (*Id.* at 20-21).  She did not, however, "see that [Armsden] was in DTs"—"he was showing no signs of DTs that [she] had ever seen."  (*Id.* at 21-22).  She also acknowledged that if she was unsure whether someone is in DTs, she should page the nurse.  (*Id.* at 22).  Mashburn testified he "didn't see anything major," did not notice that he was shaky or fidgeting, and "didn't see anything out of the ordinary, what dealings [he] had with him" on Monday, such as when he took meals to him. (Mashburn Dep. at 14, 18; *see also* Doc. 267-26).  He also did not see Armsden "spreading any blood around in his cell" on Monday.  (Mashburn Dep. at 21).  Mercer, the nurse practitioner, visited the jail on Monday around 5:30 p.m. as part

---

personal information, including the length, to the day, of his stay in a Texas prison, and described a recent home burglary he had committed, explaining how he had cut his arm on the broken glass through which he had obtained entry into the home. (*Id.* at 1-4).  Turner noted that Armsden was "shaking throughout" and that both of his forearms were bruised and red in color, that Armsden predicted that he would probably get over 200 years, that he asked for two pairs of pliers to get money unstuck from his pocket, and that he stated that he felt "really bad" although "not because of this."  (*Id.* at 2-4).  Panter construed Armsden's shaking to be nervousness because he faced a 20-year sentence for residential burglary.  He described Armsden as "just nervous, not jerking."  (Panter Dep. at 28).

of her regular schedule; neither Sgt. Verner nor Mashburn advised the nurse that Armsden needed medical attention.  (Verner Dep. at 25; Mashburn Dep. at 21).

**H.    Night Shift:  Monday April 9 To Tuesday April 10**

Sgt. Phillips was the shift supervisor for the 7 p.m. to 7 a.m. night shift starting on Monday, April 9 and ending at 7 a.m. on Tuesday April 10; Detention Officer Chad Ensley also worked those shifts from 7 p.m. to 7 a.m., and Detention Officer John Arp worked from 5:00 p.m. to 11 p.m. (*see* Doc. 268 (hereinafter Arp Dep.) at 13).   Sgt. Phillips does not recall what information she was given concerning Armsden when she began her shift on Monday, or whether she was told why Armsden was still in an isolation cell, but in general if she "was not told why a person was in isolation, [she] would go to his file and try to find out why."  (Doc. 284 (hereinafter Phillips Dep.) at 23, 26).  She also does not remember being made aware of anyone's suspicions that Armsden was having DTs, although that was information she would expect to be passed from one shift to the next.  (*Id.* at 37). No one gave Arp any information about Armsden when he began his shift at 5 p.m. that day, and he is unaware if any information was exchanged about Armsden during the 7 p.m. shift change.  (Arp Dep. at 21-22).  Arp worked in the tower during that shift, while Chad Ensley patrolled the dormitories.  (*Id.* at 14, 19).

Between 7 p.m. and 9 p.m. Monday night, Sgt. Phillips tried to talk to Armsden, and she also requested that the male jailers talk with him.  (Phillips Dep.

at 27-28).  She testified that Armsden appeared intoxicated and was unable to hold a conversation with her.  (*Id.* at 28, 36).  Sgt. Phillips testified that EMTs were called to the Jail between 9:00 p.m. and 10:00 p.m. because she was concerned why Armsden was still intoxicated after such a lengthy time in jail and because he was bleeding from a sore he was picking.  (*Id.* at 28-29).  Watkins, one of the EMTs, testified that they were actually called to the jail to see another inmate, Mr. Watson, who was vomiting (*see* Doc. 278 (hereinafter Watkins Dep.) at 17; *see also* Arp Dep. at 42); Sgt. Phillips does not disagree that may have been the case. (Phillips Dep. at 29).  When asked during her deposition whether she suspected that Armsden "might be suffering from alcohol withdrawal or DTs," Sgt. Phillips responded, "I didn't have an opinion on that . . . .  I just didn't think about it."  (*Id.* at 42).

EMTs Watkins and Epperson arrived around 10 p.m. and attended to inmate Watson.  (Watkins Dep. at 16-17).  Prior to the EMTs' arrival, Arp did not know anything about Armsden's condition, and he did not make the call to summon them.  (Arp Dep. at 28, 50).  He had not spoken with Armsden, he had not observed him bleeding, and he had no information about Armsden possibly having DTs or his escape attempt.  (*Id.* at 28, 52, 54).  After the EMTs treated inmate Watson, Arp accompanied Watkins and Epperson to Armsden's cell.  (*Id.* at 30, 42).  Arp believes that Sgt. Phillips asked him to take the EMTs to see Armsden

while they were at the jail treating inmate Watson because Armsden was bleeding. (*Id.* at 42-43).  Arp does not recall having a discussion about Armsden "possibly coming down from drugs or alcohol[.]"  (*Id.* at 43).

Sgt. Phillips believes that the EMTs would have been told how long Armsden had been at the jail, that he was arrested for DUI, and so intoxicated when he was brought in they could not complete booking him (Phillips Dep. at 29-30), but the EMTs testified that they had absolutely no history on the patient, and that no one gave them any information about Armsden, such as when he was arrested, for what offense, or that he was suspected of having DTs  (Watkins Dep. at 16, 21, 32, 45; Doc. 273 (hereinafter Epperson Dep.) at 20).  It appears that Arp primarily dealt with the EMTs (*see* Arp Dep. at 44); Plaintiff does not point to any evidence that Ensley spoke with the EMTs.  (*See* Doc. 261 at 45-47).

Arp testified that he saw Armsden's face was bleeding, and there was blood on the walls from where he touched his face to the wall, or touched his face and then touched the wall, blood on his clothes, and blood spots on the floor.  (Arp Dep. at 30, 32).  Armsden was pale with a laceration on his face; he was unsteady on his feet and trembling.  (*Id.* at 40).  Arp testified, "I thought he wasn't right," that Armsden "pointed at his head," and Arp "thought maybe he had a mental illness or something."  (*Id.*).  He "just didn't seem rational"—"he was talking about a limb falling out of the tree and hitting his face, and as he spoke, he made it

20

sound like the tree was in his cell."  (*Id.* at 40-41).  Arp does not recall whether

there was any discussion with the EMTs about alcohol withdrawal.  (*Id.* at 43).

The EMTs concluded Armsden may have been mentally ill, cleaned the lacerations

on his face, and left.  (*Id.* at 45-46; Watkins Dep. at 18-19; Doc. 267-24).  Watkins

testified that they recommended to an unidentified jailer that Armsden "possibly

[be] seen by psych eval or some doctor" (Watkins Dep. at 31), but Arp does not

recall that the EMTs gave him any instructions concerning Armsden when they

left.  (Arp Dep. at 45).

    After the EMTs left at around 10:30 p.m., Arp visited Armsden a few times

before his shift ended at 11 "[b]ecause of his speech and because he had been

picking at the cut on his face."  (*Id.* at 47).  He had to talk to Armsden to get him to

lie down because he "didn't seem . . . to be in his right mind," and Arp had to

reassure him that there were no trees or limbs in his cell.  (*Id.* at 48-49).  Armsden

did not talk about alcohol or say that he needed a drink.  (*Id.* at 49).  Before he left,

he told Chad Ensley "to keep an eye on" Armsden.  (*Id.* at 52).  Sgt. Phillips

remained at the Jail until 7 a.m.  (Phillips Dep. at 32).  Sgt. Phillips does not

remember how often she checked on Armsden, whether he slept, whether he

picked sores on his face, or whether there was any blood on him or his cell before

her shift ended.  (*Id.* at 32-34).

When Mashburn returned to the Jail at 5:45 a.m. Tuesday morning for the day shift, Ensley told him that Armsden "had been picking on a sore on his face." (Mashburn Dep. at 21).  Ensley told Mashburn that "EMTs had already been up to check Mr. Armsden and that he was still bleeding."  (*Id.* at 22).  Mashburn and Ensley then went to Armsden's cell, and when they opened the door, "Armsden was sitting on the mattress and [Mashburn] looked to the right and there was some smears of blood, you know, finger, and [Mashburn] saw some blood here and he had some blood on his clothes. You know, not massive amount.  Just, you know, where he had been picking at his face."  (*Id.*).

Mashburn also noticed that Armsden was "acting different" – "[Mashburn] felt [Armsden] didn't understand what [he] was asking him," and "[Armsden] was talking about things that made no sense."  (*Id.*).  Mashburn then asked another Jailer, Josh Patterson, to call the EMTs.  (*Id.*).  Sgt. Phillips was also consulted about calling the EMTs.  (Phillips Dep. at 39-40).  Armsden "was talking about things that did not make any sense," and Mashburn told the EMTs that he believed Armsden should be taken to the hospital, but no one responded, so he is not sure whether they heard him.  (Doc. 267-26 at 2; Mashburn Dep. at 17, 47).  The EMTs were unable to obtain a history from Armsden because he was too disoriented and incoherent, and again unable to obtain a blood pressure because he was too "fidgety."  (Watkins Dep. at 34, 40, 57; Mashburn Dep. at 31).  They had to assist

Armsden to stand, as he was unsteady on his feet, and Armsden was still talking about a tree limb hitting him. (Watkins Dep. at 36-40). The EMTs also observed that blood was smeared all over the cell. (*Id.* at 35-36). Mashburn, along with the EMTs, cleaned Armsden up, changed his clothes, and moved him to another cell. (Mashburn Dep. at 24, 26-28). They had to assist Armsden in changing his clothes because he was unable to put his clothes on by himself. (Watkins Dep. at 39). Mashburn tried to have a conversation with Armsden, but he was not able to have a conversation and was not able to follow their directions; he described him as "acting completely different that morning than he was the day before." (Mashburn Dep. at 27, 30). Mashburn "could tell that Armsden was on drugs or that he was an alcoholic because of the way he was acting." (Doc. 267-26; Mashburn Dep. at 14, 16).

Mashburn does not remember whether he was told that when Armsden came to the jail he was so intoxicated he could not stand; he does not believe he told the EMTs that Armsden had originally come to the jail for DUI or intoxication, and he does not remember if anyone else gave the EMTs that information. (Mashburn Dep. at 30-31). The EMTs did not provide any information to Mashburn about how to handle Armsden from that point forward; nevertheless, Mashburn decided to check on Armsden periodically. (*Id.* at 33).

Sgt. Verner arrived at the Jail at approximately 6:40 a.m., while the EMTs were still there, and Sgt. Phillips told Verner that they had been there twice because Armsden "kept picking sores."  (Verner Dep. at 28-29; Doc. 267-21).  Sgt. Verner testified that the EMTs told her that "Armsden probably needed to be somewhere where he could dry out," which she understood to mean to "come off of whatever he was on," and "that he was suffering from withdrawals[.]"  (Verner Dep. at 29, 39).  She does not remember having a discussion with the EMTs about Armsden's history, whether he was on drugs or alcohol or was an alcoholic. (Verner Dep. at 34).  She was not present when the EMTs were examining Armsden.  (Verner Dep. at 31).  Sgt. Verner told them she would notify Captain Newman.  (*Id.* at 29; Doc. 267-29).  She did not have the authority to advise the EMTs to transport Armsden, and although she had the authority to page Newman to ask that Armsden be transported, she did not do so because he "was due to walk through the door at any moment at that point[.]"  (Verner Dep. at 29-30).  The EMTs left around 7:00 a.m.  (Watkins Dep. at 40-41).  When they left, Armsden was lying on a mattress that Mashburn had placed on the floor of his cell[11], talking incoherently.   (*Id.* at 39-40). Sgt. Verner testified that when the EMTs left, Armsden was still disoriented and acting "fidgety and restless." (Verner Dep. at

---

[11] Mashburn explained that he put the mattress on the floor because he was afraid that if he put it on the bed, Armsden would fall off and get hurt.  (Mashburn Dep. at 29-30).

37).  She still did not know if his symptoms were DTs from drugs or alcohol, but she "knew he was coming off something," and that "he needed help."  (*Id.* at 37). Sgt. Verner understood that DTs can be a life threatening condition and if left untreated seriously increases the risk of death.  (*Id.* 41-42).

### I.   Armsden's Death:  Tuesday April 10

Sgt. Verner testified that she paged the nurse at 7 a.m., but Mercer did not respond. (*Id.* at 39-40).  Sgt. Verner went to check on Armsden about 10 minutes after the EMTs left, and he was sitting in his cell; his arm and face were bandaged, and he was picking at the bandages.  (*Id.* at 32).  When Sgt. Verner checked on Armsden about 30 minutes later, he had one of his bandages "pretty much pulled off."  (*Id.* at 33).  When she checked on him again, about 30 minutes later, he was "picking at his arms."  (*Id.* at 34).  Mashburn was checking on Armsden every 10 to 20 minutes.  (*Id.* at 32; Mashburn Dep. at 34).  When Captain Newman arrived that Tuesday morning, Sgt. Verner told him that EMTs had been there twice that night, and they had said that Armsden needed to "go to the hospital to dry out." (Verner Dep. at 30).  Captain Newman responded that he would consult with Sheriff Ensley.  (*Id.* at 30, 40).  Just after 8:00 a.m., Captain Newman, Sgt. Verner, and Mashburn discussed calling the nurse, but they did not call or page the nurse or doctor at that time.  (Newman Dep. at 25-26).  Captain Newman decided that he would plan to have a doctor or nurse come to evaluate Armsden later that day, and

that he would notify the doctor's office sometime after the nurse opened up the doctor's office around 9 a.m.  (*Id.* at 33-34).

At around 8:15 a.m., Mashburn looked into Armsden's cell and found him sitting against the wall with his eyes closed, but he appeared to be breathing. (Mashburn Dep. at 34-36).  At 8:35, Mashburn looked in on Armsden and saw him slumped down in his cell and could not see any movement.  (*Id.* at 36).  Mashburn told Captain Newman and Sgt. Verner that Armsden was not breathing, and that he thought Armsden was dead.  (Verner Dep. at 34-35; Mashburn Dep. at 37; Newman Dep. at 27).  Sgt. Verner checked his ankle, wrist, and neck and was not able to establish a pulse.  (Verner Dep. at 35; Mashburn Dep. at 37).  She yelled for Officer Patterson to call the EMTs.  (Verner Dep. at 35).  Captain Newman, Sgt. Verner, and Mashburn closed the cell door while they waited for EMTs to arrive to "preserve the evidence."  (Newman Dep. at 27-28).  No one attempted CPR; Sgt. Verner believed that CPR was "a moot point" at that time, and Captain Newman "could tell he was dead" because he had "seen enough dead bodies."  (Verner Dep. at 35; Newman Dep. at 28-29).  Armsden was officially pronounced dead at 9:32 a.m. by the Fannin County Coroner; the cause of death was alcohol withdrawal with "other significant conditions" contributing to his death of alcoholic cardiomyopathy and cirrhosis of the liver.  (Doc. 267-1).

No evidence suggests that Armsden ever explicitly requested medical assistance or that any Jail officer knew of his history of alcoholism or other medical background information.  Dr. M. Daniel Byrd, Plaintiff's medical expert, testified however, that to a reasonable degree of medical certainty Armsden would have survived "had Mr. Armsden receive[d] an intake medical evaluation or had he received proper medical evaluation and treatment for alcohol withdrawal at any time after he began exhibiting first symptoms."  (Doc. 264 ¶¶ 315-16; *see also* Doc. 269 (hereinafter Byrd Dep.) at 90-91, 110-111).[12]

## II.   **Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "[Former] Rule 56(c) [now Rule 56(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant. *Burton v. City of Belle Glade*, 178 F.3d

---

[12]  In evaluating whether each individual Defendant is entitled to summary judgment, the undersigned has set out the evidence of his or her involvement in greater detail below.

1175, 1187 (11th Cir. 1999). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 970 (11th Cir. 2002) (internal quotations omitted). And "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted); *see Pollinger v. IRS Oversight Bd.*, 362 Fed. Appx. 5, 12 (11th Cir. 2010) ("Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. '[C]onclusory allegations without specific supporting facts have no probative value' and a party opposing summary judgment must set forth 'specific facts to show why there is an issue for trial.' " (citations omitted) (quoting *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000))).

The movant bears the initial burden of demonstrating that summary judgment is warranted. *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th

Cir. 1990).  The movant may do so by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Once the movant has properly supported the summary judgment motion, the non-movant then must "come forward with specific facts showing that there is a *genuine issue for trial*," i.e., that the evidence is sufficient to support a jury verdict in the non-movant's favor.  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (internal quotations omitted); *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that "non-moving party must come forward with *significant, probative evidence*" (emphasis added)). "[C]onclusory assertions . . . [without] supporting evidence are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); *see also McKeithen v. Jackson*, 3:11-CV-00190-WHA, 2013 U.S. Dist. LEXIS 182436, at *8 (M.D. Ala. Dec. 5, 2013) (noting that "when a plaintiff fails to set forth specific facts *supported by requisite evidence* sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party" (emphasis added)), *adopted by* 2014 U.S. Dist. LEXIS 729 (M.D. Ala. Jan. 6, 2014).

A motion for summary judgment may be supported or opposed with the "materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "As a general rule, the court may consider on a Rule 56 summary judgment motion any material that would be admissible or usable at trial."  *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 n.4 (11th Cir. 1985) (assuming without deciding "that authenticity and completeness are among the evidentiary requirements of Rule 56"); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (stating that a court "may consider only . . . evidence [that] can be reduced to an admissible form," and noting that "evidence that is otherwise admissible may be accepted in an inadmissible form at summary judgment stage," but that hearsay generally cannot "be reduced to admissible form").

## III.  **Plaintiff's Federal Law Claims**

Plaintiff asserts claims pursuant to 42 U.S.C. § 1983[13] based on Defendants' alleged deliberate indifference to Armsden's serious medical needs, in violation of

---

[13]  42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

his Eighth and/or Fourteenth Amendment rights, resulting in pain and suffering and ultimately his death.  (Counts One, Three).[14]  Plaintiff also asserts claims for punitive damages (Count Two) and attorney's fees and costs pursuant to 42 U.S.C. 1988 (Count Four).

### A.   Plaintiff's Claims Against Fannin County And Defendants In Their Official Capacities, Including Sheriff Kirby

### 1.   Claims Against Defendants In Their Official Capacities

Because the lawsuit against each individual Defendant in his or her official capacity is actually a lawsuit against Fannin County, and Plaintiff has also sued the County, all of her official-capacity claims against the individual Defendants and Sheriff Kirby, who is sued in his official capacity only, are subject to summary judgment.  *See, e.g.*, *Robinson v. Integrative Det. Health Servs.*, No. 3:12-CV-20 (CAR), 2014 U.S. Dist. LEXIS 41688, at *43-44 (M.D. Ga. Mar. 28, 2014) (dismissing official capacity claim against Sheriff as duplicative of the plaintiff's claim against the County); *Cipriani v. Fulton Cnty.*, No. 1:07-CV-0069-CAP, 2008 U.S. Dist. LEXIS 111784, at *7 (N.D. Ga. Nov. 18, 2008) (dismissing official capacity claims against the sheriff and two deputies as redundant because, "[t]o the extent that the plaintiff is alleging failure to render immediate medical care against

---

[14] Count Three is a claim for wrongful death pursuant to § 1983 and state law.  The facts underlying that claim are essentially the same as for the deliberate indifference claim, and so the undersigned's analysis of Plaintiff's deliberate indifference claims applies to Plaintiff's wrongful death claim as well.

Freeman, Stokes, and Angry in their official capacities, these claims are properly brought against Fulton County, which has been named as a defendant in this action"). Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on all of Plaintiff's federal claims against all Defendants in their official capacities, including Sheriff Kirby.[15]

### 2.    Claims Against Fannin County

---

[15] Defendants also argue that Plaintiff's official capacity claims against Sheriff Kirby should be dismissed because he was acting as an "arm of the state," not the county, and is therefore protected by Eleventh Amendment immunity and is not a "person" within the meaning of § 1983. (*See* Doc. 250-5 at 3-6). Defendants cite cases from this district in support of the proposition that Sheriff Kirby was acting as an "arm of the state," (*see id.* at 4), but there are also contrary decisions in this and other districts. *See, e.g., Robinson*, 2014 U.S. Dist. LEXIS 41688, at *43 (noting that "every district court that has addressed this issue has held that a Georgia sheriff acts as an arm of the county when providing medical care"); *Trammell v. Paxton*, No. 2:06-CV-193, 2008 U.S. Dist. LEXIS 108528, at *49 (N.D. Ga. Sept. 29, 2008) (J. O'Kelley) (explaining that " '[t]he Northern District of Georgia's decision in *Dukes* [*v. Georgia*, 428 F. Supp. 2d 1298, 1318 (N.D. Ga. 2006)], as well as the Eleventh Circuit's decision in [*Manders v. Lee*, 338 F.3d 1304, 1319, 1322 (11th Cir. 2003)] suggest that in providing medical care for jail inmates, a sheriff acts as an arm of the county,' " and finding that "to the extent plaintiff asserts claims against Sheriff Paxton for failure to provide medical care to inmates, [he] is not entitled to the protections provided to state actors" (quoting *Hooks v. Brogdon*, No. 07-42, 2007 U.S. Dist. LEXIS 72585, at *4 (M.D. Ga. Sept. 29, 2007))), *aff'd*, 322 Fed. Appx. 907 (11th Cir. 2009). If Defendants are correct that Sheriff Kirby was acting as an arm of the state, then he is entitled to summary judgment on Plaintiff's federal claims due to his Eleventh Amendment immunity. If, however, he was acting as an "arm of the county," then as discussed above, Plaintiff's official capacity claims should be dismissed as duplicative of her claims against the County. Either way, he is entitled to summary judgment.

Defendants argue that Fannin County cannot be liable here because, among other things, Plaintiff cannot show that any alleged constitutional deprivation occurred as the result of a County or Sheriff's Office custom or policy that constituted deliberate indifference to that constitutional right.  (Doc. 250-5 at 10). The undersigned agrees.

"A county's liability under § 1983 may not be based on the doctrine of respondeat superior."  *Grech v. Clayton Cnty*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Rather, "[a] county is liable under section 1983 only for acts for which [the county] is actually responsible" and "a county is liable only when the county's official policy causes a constitutional violation."  *Grech*, 335 F.3d at 1329 (internal quotations omitted).

> [A plaintiff] may demonstrate that a policy or custom exists by identifying: (1) an officially promulgated policy; (2) an unofficial custom or practice shown through repeated acts of a final policymaker, *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc); or (3) an action by a decisionmaker who "possesses *final authority* to establish *municipal policy* with respect to the action ordered."  *Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir. 2003).

*Demmons v. Fulton Cnty*, No. 1:09-CV-2312-TWT-WEJ, 2010 U.S. Dist. LEXIS 90829, at *46-48 n.43 (N.D. Ga. Aug. 2, 2010), *adopted by* 2010 U.S. Dist. LEXIS 88380 (N.D. Ga. Aug. 25, 2010) (internal quotation omitted).  A local government

body's failure to correct the unconstitutional actions of its employees can amount to a custom or policy if it "tacitly authorizes these actions or displays deliberate indifference towards the misconduct."  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (internal quotation omitted); *see also Williams v. DeKalb Cnty*, 327 Fed. Appx. 156, 160 (11th Cir. 2009) (unpublished decision) ("A police department's failure to train or supervise its officers can constitute a policy sufficient to trigger governmental liability but only in limited circumstances, such as when that failure amounts to deliberate indifference to the rights of persons with whom the police come into contact." (internal quotations omitted)).  "To establish deliberate indifference, 'a plaintiff must present some evidence that the [county] knew of a need to train and/or supervise in a particular area and the [county] made a deliberate choice not to take any action.' " *Id.* (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)).

Here, Plaintiff has not pointed to evidence that the County had a custom, policy, or practice of deliberate indifference to serious medical needs, nor has she shown that the County was on notice of any such custom, policy or practice.  She has not pointed to an "officially promulgated policy." It is uncontroverted that during all times relevant to this lawsuit, the County provided medical care to inmates through a contract with Georgia Mountains Health Services, signed by Sheriff Ensley (*see* Doc. 282-1 at 7 through 17), and the Sheriff's Office

promulgated policies, approved by Sheriff Ensley, governing the provision of medical care at the jail (*see* Doc. 250-3).  Nor has she shown "a pervasive and well-settled custom [of deliberate indifference] with the force of law."  *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1263 n.11 (11th Cir. 2010).  "As a general rule, an 'isolated incident, however unfortunate, does not demonstrate evidence of the County's "persistent" or "widespread" policy,' " and "will not be considered 'so pervasive as to be a custom or practice.' "  *Id.* (quoting *McDowell v. Brown*, 392 F.3d 1283, 1290-91 (11th Cir. 2004) and *Grech*, 335 F.3d at 1330 n.6).  Nor has Plaintiff shown that Sheriff Ensley, the final policymaker, maintained "an unofficial custom or practice shown through repeated acts," or pointed to an action by a decision maker who "possesses *final authority* to establish *municipal policy* with respect to the action ordered."  *Quinn*, 330 F.3d 1320.

Plaintiff contends, however, that *Captain Newman* was a final policymaker, and his actions "caused the constitutional violation to occur."  (Doc. 262 at 41).  She asserts that Sheriff Ensley authorized Captain Newman to "run all administrative functions of the jail and to take disciplinary action against jail officers without the sheriff's approval, including any action short of termination of an officer."  (Doc. 262 at 42).  Therefore, according to Plaintiff, "Captain Newman . . . effectively stands in the shoes of Sheriff Ensley with respect to managing and disciplining jail officers."  (*Id.*).  Plaintiff argues that the County can be held liable

"to the extent that Newman's management policies influenced and directly contributed to the death of Jason Armsden, or should it be proven that Newman personally participated in the unconstitutional acts that caused Armsden's death." (*Id.*).  Specifically, and as discussed in more detail below in addressing Plaintiff's claims against Captain Newman, Plaintiff alleges that Captain Newman discouraged officers from contacting the nurse and EMTs, and personally participated in Armsden's medical care (or lack thereof).  (*Id.* at 43-44).

As an initial matter, the undersigned notes that Plaintiff has not pointed to evidence that Sheriff Ensley knew about Captain Newman's alleged policy or practice of discouraging employees to contact medical services and then condoned or failed to correct such a policy or practice.  *See Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("County liability on the basis of ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority.").  Rather, she asserts that Ensley's delegation of authority to Captain Newman resulted in Captain Newman being a final policymaker for purposes of establishing the County's liability for Captain Newman's policies or practices.

The undersigned finds that Sheriff Ensley's delegation of authority is "insufficient to imbue [Captain Newman] with final policymaking authority for purposes of § 1983 municipal liability."  *Doe*, 604 F.3d at 1264.  "Whether an

36

official or entity is the final policymaker is a question of state law reserved for the judge to determine." *Robinson*, 2014 U.S. Dist. LEXIS 41688, at *27; *see also Doe*, 604 F.3d at 1264 ("Determining the persons or bodies that have final policymaking authority for the defendant is a matter of state law to be determined by the trial judge and not the jury."). "Georgia law vests final decision making and policymaking authority of inmate medical care to the Sheriff, as a representative of the County." *Robinson*, 2014 U.S. Dist. LEXIS 41688, at *29 (citing O.C.G.A. § 42-4-4(a)(2) ("It shall be the duty of the sheriff . . . [t]o furnish persons confined in the jail with medical aid . . ."). Although decisionmaking can be delegated to a subordinate, the Eleventh Circuit has "strictly interpreted 'Monell's policy or custom requirement to preclude § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion.' " *Id.* (quoting *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)). "In other words, final policymaking authority over a particular subject matter does not vest in an official whose decisions are subject to meaningful administrative review." *Id.* (quotations omitted).

Here, it is undisputed that "Sheriff Ensley [had] delegated primary administrative supervision over the Jail on a day-to-day basis to Captain Greg Newman" (Doc. 250-4 ¶ 327) in all matters except personnel changes (Doc. 271

(Sheriff Ensley Dep.) at 11).  The Sheriff testified, however, "that jail operations were [his] ultimate responsibility" and he explained that Captain Newman was not "able to enact standard operating procedures for jail operations without [the Sheriff's] approval and authorization."  (Doc. 271 at 10-11).  Thus, because Captain Newman's decisionmaking concerning jail operations, including the provision of medical care to inmates, was subject to meaningful review by the Sheriff, the *Sheriff*, not Captain Newman, had the final policymaking authority with respect to inmate medical care.  *See, e.g.*, *Doe*, 604 F.3d at 1264 (finding that delegation of authority to subordinates to develop disciplinary guidelines and procedures for conducting personnel misconduct investigations, and to make initial decisions whether to investigate student complaints, was insufficient to establish final policymaking authority because the Superintendent "has ultimate authority to veto or override" disciplinary recommendations); *Anderson v. Dawson*, No. 4:09cv134-RH/WCS, 2011 U.S. Dist. LEXIS 137014, at *41 (N.D. Fla. Oct. 5, 2011) (dismissing official capacity claim against the jail administrator because he did not have final policymaking authority: "While Defendant Campbell [the Sheriff] delegated authority to Defendant Bennett 'to oversee the day-to-day operation of the' jail, all policymaking authority rests solely with Defendant Campbell," and "discretionary decisions made by Defendant Bennett are also subject to review by Defendant Campbell as the Sheriff").

38

Because the Sheriff is the final County policymaker with regard to inmate medical care, the County cannot be held liable for any informal custom or practice that Captain Newman may have established regarding the summoning of medical care for Jail inmates.   Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** as to all of Plaintiff's federal claims against Fannin County.

### B.   Plaintiff's Deliberate Indifference Against Individual Defendants

The individual Defendants argue that they are entitled to summary judgment on Plaintiff's § 1983 claims because none violated Armsden's constitutional rights, and because there was no constitutional violation, and because they are each protected by qualified immunity.   (*See generally* Docs. 248-2, 250-6 through 250-12).

### 1.   Substantive Constitutional Violation

### a.   Legal Standard

To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that an act or omission committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States.   *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).   Because Armsden was a pre-trial detainee, his claims are properly brought pursuant to the Fourteenth Amendment, rather than the Eighth

Amendment. *See Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1115 (11th Cir. 2005) (explaining that for pre-trial detainees, "the Eighth Amendment prohibitions against cruel and unusual punishment do not apply," but they do "have a Fourteenth Amendment due process right to receive medical treatment for injuries and illness" (internal quotations omitted)).  The standard for analyzing deliberate indifference claims is the same, however, whether brought under the Eighth or Fourteenth Amendments. *See Goss v. Paxton*, No. 2:10-CV-0178-WCO, 2010 U.S. Dist. LEXIS 144106, at *4 (N.D. Ga. Nov. 9, 2010) ("Deliberate indifference to the serious medical needs of an inmate or pre-trial detainee violates the Eighth and Fourteenth Amendments, and the standard is the same under both amendments." (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001); *Lancaster v. Monroe Cnty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997)).

" 'However, not every claim by a prisoner that he has not received adequate medical treatment states a [constitutional] violation.' "  *Id.* (quoting *McElligott v. Foley*, 182 F.3d 1249, 1254 (11th Cir. 1999)).  Rather, "[t]o prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury."  *McDaniels v. Lee*, 405 Fed. Appx. 456, 458 (11th Cir. 2010) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291,

1306-07 (11th Cir. 2009)); *see also Goss*, 2010 U.S. Dist. LEXIS 144106, at *4

("plaintiff must demonstrate (1) an objectively serious medical need that, left

unattended, poses a substantial risk of serious harm, and (2) 'that the response

made by public officials to that need was poor enough to constitute an unnecessary

and wanton infliction of pain, and not merely accidental inadequacy, negligence in

diagnosis or treatment, or even medical malpractice actionable under state law' "

(quoting *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000)).

### b. <u>Application</u>

### i. <u>Objectively Serious Medical Need</u>

First, Plaintiff must show that Armsden had an objectively serious medical

need.  "A 'serious medical need' is one that is diagnosed by a physician as

requiring treatment or one that is so obvious that a lay person would recognize the

need for medical treatment."  *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317

(11th Cir. 2010) (internal quotations omitted).

Armsden was not diagnosed by a physician as requiring treatment, but the

undersigned finds at least an issue of fact on whether his need was "so obvious that

a lay person would recognize the need for medical treatment."  Viewing the

evidence in the light most favorable to Plaintiff, the record shows that Armsden

was arrested for DUI and entered the Fannin County Jail on April 6, 2007 while

severely intoxicated, so intoxicated he could not walk without support, i.e., "he

41

was essentially carried, stumbling in." (C. Davenport Dep. at 38). There is also evidence that on Saturday, he began experiencing symptoms consistent with delirium tremens, a sign of acute alcohol withdrawal. Delirium tremens is "a severe, sometimes fatal, form of d[elirium][16] due to alcoholic withdrawal following a period of sustained intoxication." *Stedman's Medical Dictionary*, 470 (Maureen Barlow Pugh et al. eds., 27th ed. 2000); *see also* (Doc. 259-7 at 1 (*Delirium tremens* "is a life-threatening manifestation of alcohol withdrawal."); Mercer Dep. at 64 (testifying that alcohol withdrawal can have fatal complications)).[17] Mercer, the nurse practitioner who provided medical care to the Fannin County inmates, testified that alcohol withdrawal symptoms include incoherent speaking, anxiety, disorientation, lack of interest or refusal to eat, fatigue, lethargy, irritability, jumpiness, shakiness, paranoia, mood swings, nightmares, insomnia, rapid heart rate, confusion, hallucinations, unsteadiness, fever, seizures, and heart arrhythmias. (Mercer Dep. at 67-69). In *Lancaster v. Monroe* County, 116 F.3d 1419 (11th Cir. 1997), the court described typical symptoms of alcohol withdrawal:

---

[16] Delirium is "[a]n altered state of consciousness, consisting of confusion, distractibility, disorientation, disordered thinking and memory, defective perception (illusions and hallucinations), prominent hyperactivity, agitation and autonomic nervous system overactivity." *Stedman's* at 470.

[17] As the Fannin County Defendants note, however, Dr. Byrd testified that the severity and symptoms of alcohol withdrawal vary widely and are not always serious. (Doc. 297 ¶ 164; *see* Byrd Dep. at 73-74 (noting that although some cases of alcohol withdrawal are mild, "you don't know that until the act is over")).

> Chronic alcoholics may suffer from epileptic seizures and/or DTs during withdrawal. *See* 9 *Attorneys' Textbook of Medicine* P 59A.22(2) (Roscoe N. Gray & Louise J. Gordy eds., 3d ed. 1997) . . . . . DTs is "a form of acute organic brain syndrome due to alcohol withdrawal" which is marked by "sweating, tremor, atonic dyspepsia, restlessness, anxiety, precordial distress, mental confusion, and hallucinations." *Stedman's Medical Dictionary* 409.

*Id.* at 1421 n.4.

Here, as discussed in more detail below, there is evidence that Armsden exhibited symptoms consistent with acute alcohol withdrawal throughout his incarceration, including among other things, shaking, sweating, confusion, disorientation, hallucinations (including statements that a tree branch fell on him in his cell), and difficulty walking. *See Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010) (listing symptoms of "severe alcohol withdrawal" as "hallucinations, slurred speech, incoherence, and difficulty walking")). Finally, it is uncontroverted that the cause of death listed on his death certificate is "alcohol withdrawal." (Doc. 267-1). The evidence is thus sufficient for a reasonable juror to find that Armsden had a serious medical need that, left untreated, posed a substantial risk of harm. *See, e.g.*, *Meiller v. Pasco Cnty.*, No. 8:09-CV-1847-T-33AEP, 2010 U.S. Dist. LEXIS 140523, at *25-26 (M.D. Fla. Sept. 30, 2010) (explaining that "[c]ourts have previously determined that serious drug and alcohol addiction can constitute an objective[ly] serious medical need" (listing cases), and finding that the plaintiff's allegations that the decedent's drug withdrawal resulted

in his death was sufficient to allege an objectively serious medical need); *see also Sawyer v. Collins*, No. 2:12-0020-KD-M, 2014 U.S. Dist. LEXIS 23217, at *56 (S.D. Ala. Feb. 25, 2014) (finding that the worsening of inmate's condition and ultimate death showed that his "serious medical condition posed a substantial risk of serious harm if left unattended").

## ii.  Acted With Deliberate Indifference

Next, Plaintiff must show that each Defendant acted with deliberate indifference to Armsden's serious medical need.  To make that showing, Plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *McDaniels*, 405 Fed. Appx. at 458.  "With respect to the 'subjective knowledge' component, [the Eleventh Circuit has] stated that defendants 'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* must also draw the inference.' "  *Id.* (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)).  "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]"  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (quotation omitted).  Moreover, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id.* (quotation omitted).  The Court notes,

44

however, that "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." *Harper*, 592 F.3d at 1234 (quotation omitted). Instead, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Id.* (quotation omitted).

After showing a defendant's subjective awareness of the substantial risk of harm, Plaintiff must show that the defendant "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Even where there was a delay in providing medical care, Plaintiff must show that the defendant's action, or inaction, constituted more than negligence, gross negligence, or even medical malpractice. *See Nimmons v. Aviles*, 409 Fed. Appx. 295, 297 (11th Cir. 2011) (unpublished decision) (explaining that "accidental inadequacy, negligence in diagnosis or treatment, [and] medical malpractice" are insufficient to establish deliberate indifference). Rather, Courts should consider: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert*, 510 F3d at 1327.

Set against the factual backdrop set out above, the Court must consider what each Defendant knew about Armsden's medical needs, from personal observation or otherwise, whether they had knowledge of the risk of serious harm posed by his condition, and whether they took "reasonable measures to abate it." *Farmer*, 511

45

U.S. at 847. "Whether a particular defendant was subjectively deliberately indifferent is a unique inquiry as to each individual," and therefore, the undersigned "now carefully and separately analyzes whether Defendants were deliberately indifferent to [Armsden's] medical needs." *Keele v. Glynn Cnty.*, 938 F. Supp. 2d 1270, 1293 (S.D. Ga. 2013).

### (a) Former Sheriff Ensley

Plaintiff asserts that, as the Sheriff of Fannin County, Sheriff Ensley may be liable by and through respondeat superior for the constitutional violations of the other Fannin County employees. (Doc. 208 at ¶ 103). The Eleventh Amendment does not protect a state official from claims brought against him in his individual capacity. *See Hafer v. Melo*, 502 U.S. 21, 30-31 (1991) (holding that "the Eleventh Amendment does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983" and that "state officers [are not] absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts" (internal quotations omitted)). But a supervisor is individually liable only when he "personally participates in the alleged unconstitutional conduct or when there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (noting the well-established rule "that supervisory officials

are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability").

A causal connection can be established by showing that (1) the supervisor knew about and failed to correct a widespread history of abuse, or (2) he had a custom or policy that resulted in a constitutional violation, or (3) the "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (internal quotations omitted); *see Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985) (stating that the "causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need for improved training or supervision, and the official fails to take corrective action"). But "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Cottone*, 326 F.3d at 1360.

It appears Plaintiff claims that Sheriff Ensley is liable under a supervisory theory because he delegated administration of the Jail, and the Jail's medical policies, to Captain Newman. (Doc. 262 at 16). But the mere delegation of authority to a subordinate, standing alone, does not create supervisory liability. Moreover, there is no evidence that Sheriff Ensley participated, in his individual capacity, in any decision regarding Armsden's medical care or that a Jail policy

47

that he had put in place resulted in harm to Armsden.  (*See* Doc. 250-4 ¶¶ 324-331; Doc. 264 ¶¶ 324-331).  In the same vein, there is no evidence, and Plaintiff does not argue, that Sheriff Ensley was aware of Captain Newman's alleged policy of discouraging jailers from summoning emergency medical attention and failed to stop it.  (Doc. 262 at 15-17).  As an afterthought, Plaintiff appears to claim that Sheriff Ensley did not investigate Armsden's death (*see* Doc. 262 at 45), but that is an insufficient basis for a claim that Sheriff Ensley was deliberately indifferent to Armsden's serious medical needs while he was still alive.  Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** on Plaintiff's federal claims against former Sheriff George Ensley.

### (b)  <u>Captain Newman</u>

**1)      <u>Personal Participation</u>**

By April 2007, Sheriff Ensley had delegated primary administrative supervision of the Jail to Captain Newman.  (Ensley Dep. at 10-11).  Captain Newman is P.O.S.T certified; the training for that certification includes training on withdrawal symptoms, or DTs, that can lead to a life-threatening medical emergency, including sweating, shaking, weakness, confusion, hallucinations, confusion, vomiting, prolonged screaming and erratic behavior, seizures, and loss of consciousness.  (Newman Dep. at 6; Docs 267-9 and 267-10).

On Saturday morning April 7, Captain Newman received a phone call from Mason advising him that "he[18] was freezing to death, he didn't know what was wrong with him." (Raper Dep. at 18). After receiving this news, Captain Newman instructed Mason to call the nurse. (*Id.* at 18).

Captain Newman arrived at the Jail between 7:30 a.m. and 8:00 a.m. Monday morning, April 9, 2007. (Newman Dep. at 10). According to Dustin Hamby, a G.B.I. officer who investigated the circumstances surrounding Armsden's death, and who interviewed Captain Newman on April 10, 2007, Captain Newman stated that he "found out about the escape attempt and everything that had been going on with Armsden on Monday morning," and "that he was not concerned with Armsden's health until this [Tuesday] morning after the EMTs had left." (Doc. 267-19 at 1-2). Captain Newman, on the other hand, disputes that document and testified that he first learned about Armsden's escape on Tuesday April 10, 2007, and that he didn't learn anything about Armsden or his condition on Monday. (Newman Dep. at 12-13, 23, 31-32). As a matter of Jail policy, and pursuant to Captain Newman's normal routine, Captain Newman reviewed use-of-force reports, such as Sgt. Davenport's incident report detailing Armsden's apparent escape attempt and potential DTs, the day after such an incident occurred.

---

[18] In his deposition testimony, Raper does not specify whether Mason identified the inmate as Armsden. (*See* Raper Dep. at 18).

(Newman Dep. at 17).  But Captain Newman's uncontested testimony reveals that he did not receive Sgt. Davenport's incident report on Monday April 9, 2007, and only reviewed it Tuesday April 10, after Armsden had died.  (*Id.*).

On Tuesday morning at 8:00 a.m., Captain Newman arrived at the jail and was told by Sgt. Verner that "we needed to do something about Armsden." (Verner Dep. at 43).  Sgt. Verner also informed Captain Newman that the EMTs "had advised that [Armsden] be -- go to the hospital to dry out.  Told him that they had already been there twice in the night."  (*Id.* at 30).  After having a discussion with Sgt. Verner and Mashburn, Captain Newman decided that he would have a doctor or nurse come evaluate Armsden and that he would notify the nurse at 9:00 a.m. i.e., the time the nurse's office opened up, and see "if she [could] have the doctor come up."  (Newman Dep. at 33-34).   Armsden was later found unconscious and without a pulse shortly after 8:30 a.m.  (Mashburn Dep. at 37).

The undersigned concludes that this background does not create a genuine issue of material fact as to whether Captain Newman was deliberately indifferent to Armsden's serious medical needs.  In arguing deliberate indifference, Plaintiff relies on three pieces of evidence: (1) Mason's phone call to Captain Newman on April 8, 2007; (2) Dustin Hamby's investigative summary, in which he writes that Captain Newman learned about everything that involved Armsden on April 9, 2007; and (3) Captain Newman's failure to call for a nurse or a doctor immediately

upon arriving at work Tuesday April 10, 2007.  (Doc. 262 at 14-15).  With respect to Mason's phone call, the evidence shows that Mason informed Captain Newman that Armsden was "freezing to death," and that, based on this limited description of Armsden's symptoms, Captain Newman immediately advised Mason to call the nurse.  (Raper Dep. at 18).  Plaintiff contends that "[i]t is not an unreasonable assumption to say that Mason would have also advised Newman that Armsden was a recent DUI arrestee" and that Armsden "needed a medical evaluation."  (Doc. 262 at 14).  But that argument does not establish deliberate indifference.  In the first place, Plaintiff points to no evidence from Captain Newman, Raper, or Mason's deposition testimony to support that assumption.  Moreover, even if Mason informed Captain Newman about those facts, Captain Newman's undisputed deposition testimony establishes that he sought medical care for Armsden – he told Mason to call the nurse.

Next, Plaintiff points to Dustin Hamby's investigative summary, in which he writes that Captain Newman told him that he found out about "the escape attempt and everything that had been going on with Armsden on Monday morning."  (Doc. 267-19 at 2).  Plaintiff does not provide any specific arguments on what the vague statement "everything that had been going on" means, but it is apparent from her brief that she believes it is strong evidence that Captain Newman knew of Sgt. Davenport's incident report, and by extension, Armsden's DTs.  (Doc. 262 at 14).

But Captain Newman's undisputed testimony establishes that he received and read Sgt. Davenport's incident report after Armsden died on April 10, 2007. (Newman Dep. at 17). In addition, Plaintiff provides no deposition testimony, or other evidence, suggesting that Captain Newman spoke to, or learned about Armsden's withdrawal symptoms from, any Jailers or other Fannin County personnel on April 9, 2007. (Doc. 262 at 14). Finally, Captain Newman testified that he heard nothing about Armsden's escape or his condition on Monday morning and that he was incorrectly quoted in the investigative summary in regards to when he learned of Armsden's escape. (Newman Dep. at 12-13, 23, 31-32). In light of all of this evidence, the undersigned does not find that the investigative summary, standing alone, establishes an issue of fact on deliberate indifference.

Finally, Plaintiff faults Captain Newman's handling of Armsden's medical needs on Tuesday April 10, 2007. In particular, she claims Captain Newman was deliberately indifferent because he was "advised of Armsden's worsening medical condition including that the EMTs had told Sgt. Verner at 6:40 a.m. they believed Armsden was in withdrawals," yet did not summon emergency medical personnel. (Doc. 262 at 14). The undersigned disagrees. Upon arriving at work Tuesday morning, Captain Newman learned from Sgt. Verner that EMTs "had advised that [Armsden] … go to the hospital to dry out," (Verner Dep. at 30), and he decided that he would notify the nurse at 9:00 a.m. i.e., the time the nurse's office opened

up, and see "if she [could] have the doctor come up." (Newman Dep. at 33-34).

Plaintiff appears to criticize Captain Newman for failing to provide or summon medical care sooner. (*See* Doc. 265 at 14-15). But given the context in which Captain Newman learned of Armsden's condition, a reasonable juror could not find him deliberately indifferent for failing to recognize that Armsden's situation was an emergency. Sgt. Verner, who spoke to the EMTs about Armsden's condition before Captain Newman arrived at work (*see* Verner Dep. at 28), never told Captain Newman that the EMTs felt Armsden's condition needed immediate medical attention. More significant, the EMTs, who had treated Armsden twice, and who were authorized to transport inmates to the hospital in case of an emergency, decided not to transport Armsden's to the hospital for emergency medical care. As a jail supervisor, it was certainly reasonable for Captain Newman to rely on the experience, observations, and professional judgment of the EMTs and assume that, if Armsden's condition required immediate medical attention, the EMTs would have transported him to the hospital themselves or alerted one of the jailers of that fact. *See, e.g.*, *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1050 (11th Cir. 2014) ("Simply put, the law does not require that Sheriff Brown ignore the determination and recommendation of MHM staff. A sheriff cannot be held liable for failing to segregate mental health inmates whom trained medical personnel have concluded do not present a risk of harm to themselves or others."); *see also*

*Townsend v. Jefferson County*, 601 F.3d 1152, 1159 (concluding that jail officers were not deliberately indifferent where a medical professional had evaluated the defendant and concluded that no emergency was present, and there was no evidence that the defendant "situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged" the defendant's condition). Under these circumstances, it cannot be said that Captain Newman was deliberately indifferent because he failed to comprehend that Armsden needed immediate medical care.

Accordingly, it is **RECOMMENDED** that the motion for summary judgment (Doc. 250) be **GRANTED** as to Plaintiff's personal participation deliberate indifference claim against Newman.

## 2)   <u>Supervisory Liability</u>

Plaintiff also claims in her summary judgment brief that Captain Newman is liable under a supervisory theory because he apparently had a policy of reprimanding jailers for calling the nurse and this policy caused Armsden's constitutional violation. (Doc. 262 at 15-16). Captain Newman argues that this claim should be dismissed because it is not properly before the court; he notes that Plaintiff never alleged such a theory in her Fourth Amended Complaint or in her discovery responses. (Doc. 298 at 4).

"To assert a new claim at the summary judgment stage, the proper procedure is to amend the complaint-not argue it in a brief opposing a summary judgment motion." *Procaps S.A. v. Patheon Inc.*, 12-24356-CIV-GOODMAN, 2014 WL 3764002, at *22 n.9 (S.D. Fla. July 30, 2014) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004)). "This rule not only applies to legal claims, but to 'additional facts' as well." *Id.* (citing *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2010) (declining to consider additional facts first raised in summary judgment briefing)); *see also Cruz v. Advance Stores Co., Inc.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012) ("[A] party may not raise a new theory for the first time in response to a summary judgment motion").

Plaintiff's Fourth Amended Complaint contains only the following allegations against Captain Newman: (1) "Defendant Gregory Newman was the ranking officer … on April 9, 2007" and "was, or should have been aware of [] Armsden's symptoms or alcohol withdrawal, and failed to summon any medical attention. Defendant Newman was deliberately indifferent to [] Armsden's serious medical needs"; and (2) "At approximately 7:00 a.m. on Tuesday, April 10, 2007, Defendant Captain Greg Newman began his shift at the Fannin County Jail" and "was advised by Jail employees of [] Armsden's condition. Defendant Newman took no action to summon medical attention for Jason Armsden. Defendant

Newman was deliberately indifferent to Armsden's medical needs." (Doc. 208 at ¶¶ 46, 75). There are no allegations against Captain Newman in the Fourth Amended Complaint for supervisory liability based on a policy of discouraging jailers from calling the nurse – indeed, at no point in her Fourth Amended Complaint does Plaintiff seek supervisory liability from Captain Newman for any custom or policy. (*See generally id.*). Nor did Plaintiff reveal this "discouragement" theory of liability in her discovery responses. (*See* Docs. 294-296). In addition, the facts on which Plaintiff's theory relies – Sgt. Davenport, Raper, and Sgt. Bailey's deposition testimony that Captain Newman personally discouraged jailers from calling the nurse – are not included in the Fourth Amended Complaint, even though all of those defendants' depositions were conducted over a year before the Fourth Amended Complaint was submitted. (*See* Docs. 208, 277, 284, 288). Because Plaintiff's "discouragement theory", and the facts underlying that theory, was not raised in her Fourth Amended Complaint, the undersigned refuses to entertain it.[19]

---

[19] Even if Plaintiff had properly pled her "discouragement" claim against Captain Newman, the undersigned concludes that such a claim is deficient. "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous," *Cottone*, 326 F.3d at 1360–61, and "[i]solated incidents are generally not sufficient to establish a supervisor's liability; rather, the deprivations must be 'obvious, flagrant, rampant, and of continued duration.' " *Price v. Brown*, No. CV 112–059, 2014 WL 793625, at *9 (S.D. Ga. Feb. 25, 2014) (quoting *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308 (11th Cir.

Accordingly, the undersigned **RECOMMENDS** that the motion for summary judgment (Doc. 250) be **GRANTED** as to Plaintiff's discouragement theory deliberate indifference claim against Captain Newman.[20]

---

2006)). In the first place, there is no evidence that Captain Newman's alleged policy caused obvious, flagrant, and rampant constitutional deprivations. *Cf. Harper*, 592 F.3d at 1236-1237 (concluding that the plaintiff sufficiently alleged supervisory liability for a custom or policy where she provided facts showing that another inmate had received inadequate medical screenings). In addition, Plaintiff's evidence does not establish that Captain Newman had a custom or policy of "discouraging" jailers from seeking medical care for inmates. In the first place, if Captain Newman had such a policy, it would seem odd that he himself would instruct Mason to call the nurse based only on his knowledge that Armsden was freezing to death, and also plan to call the nurse the Tuesday of Armsden's death. Moreover, Sgt. Davenport testified that she had been reprimanded for calling the nurse by the *nurse* – all she said with respect to Captain Newman is that he told her not to bother the nurse. (C. Davenport Dep. at 36). Lacking further context, that statement – do not bother the nurse – does not imply that Captain Newman told Sgt. Davenport to *never* call the nurse, as Plaintiff seems to imply. In addition, the undersigned fails to see how Raper's testimony – "[Captain Newman] said do not call [the EMTs] unless it's an absolute emergency" – shows a custom or policy of discouragement. If anything, that testimony shows that Captain Newman wanted emergency medical personnel summoned to the jail when an inmate had an emergency medical situation. Finally, Sgt. Bailey's opinion that Captain Newman would have "a heart attack" if EMTs were called does not establish that Captain Newman had instituted a jail-wide policy of discouraging all jailers from summoning medical care for inmates.

[20] Plaintiff also asserts in her summary judgment response brief that Captain Newman may be liable under a supervisory theory because jailers were not providing inmates with medical screenings or notifying the nurse to perform a medical evaluation on all new inmates within 48 hours. (Doc. 262 at 16). But this claim is meritless. First of all, Plaintiff cites no record evidence to support those theories. (*Id.*). In addition, Plaintiff provides no evidence that Captain Newman knew about these deficiencies and failed to correct them, created a policy or custom of failing to provide medical screenings and evaluations, or directed jailers to act unlawfully or knew that they were acting unlawfully and failed to correct it.

### (c) **Sgt. Carol Davenport**

Sgt. Davenport was the shift supervisor for the night shifts from Friday night, when Armsden was arrested, through Sunday night. The undersigned finds that there is at least an issue of fact on whether Sgt. Davenport was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and drew that inference. *McDaniels*, 405 Fed. Appx. at 458. The record shows that Davenport knew that Armsden entered the Jail in a highly intoxicated state, so intoxicated he could not stand without assistance, and she could not complete the booking process. (C. Davenport Dep. at 37-38). Furthermore, she immediately developed the opinion that he should be taken for medical clearance in light of his intoxicated state. (*See id.* at 28-29, 38-39). She also observed that sometime Sunday night to Monday morning that Armsden was too weak to shower and opined that he had been having "possible DT's since [his] arrest." (*See* Doc. 288-1 at 6). Further, Raper testified that he told Sgt. Davenport at shift change Sunday night that if she did not contact the nurse, she "probably need[ed] to call EMTs" because Armsden was not eating and was not getting up. (Raper Dep. at

---

*See Cottone*, 326 F.3d at 1360 (explaining that a causal connection can be established by showing that (1) the supervisor knew about and failed to correct a widespread history of abuse, or (2) he had a custom or policy that resulted in a constitutional violation, or (3) the "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so").

31-32).  Thus, a reasonable juror could find that Sgt. Davenport had subjective knowledge of Armsden's serious medical need, i.e., his alcohol withdrawal, that left unattended posed a substantial risk of serious harm.

The question then becomes, is there evidence that she "disregarded that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847. Having considered the factors set out in *Goebert* for evaluating this element, i.e., the seriousness of the medical need; whether the delay worsened the medical condition; and the reasons for the delay, 510 F.3d at 1327, the undersigned finds there is such evidence.  It is uncontroverted that, in spite of her knowledge of Armsden's intoxication, symptoms, and apparent concern he was having DTs, Sgt. Davenport never called or paged medical personnel, including Mercer, a physician, or emergency medical services, to come to the Jail to examine Armsden.  It is further uncontroverted that Armsden had no medical evaluation or treatment during the period that Sgt. Davenport worked at the Jail, and she knew that he had had no such treatment.  As to the *Goebert* factors, as already set forth, Armsden's medical need, alcohol withdrawal, was serious, and is a condition that can and did lead to his death, as the result of the lack of medical care for that condition.  Thus, it is undisputed that the delay in obtaining medical treatment (or complete failure to provide same) worsened Armsden's condition.  Finally, issues of fact exist on the reasonableness of Sgt. Davenport's explanations for the delay (or failure) to

obtain care.   She alleges that she requested Deputies White and Davenport to transport Armsden but they refused, and she alleges that she was afraid to call the nurse directly for fear of reprisal from Mercer and/or Captain Newman because Newman had previously told her not to "bother" the nurse.   A reasonable juror could find those reasons insufficient to explain why Sgt. Davenport, in the face of Armsden's serious medical needs, failed to seek guidance from Captain Newman, or to call the nurse, a doctor, or emergency medical services as provided for by Sheriff's Office policy.

### (d)  Roger Pulliam

The undersigned finds that there is also evidence that Defendant Pulliam was deliberately indifferent to Armsden's serious medical needs.   Pulliam observed Armsden lying on the floor of his cell shaking and refusing to eat on Saturday night (Doc. 267-14); he observed that Armsden was "too weak" to shower at some point Sunday night to Monday morning according to Sgt. Davenport (Doc. 288-1 at 6); and Pulliam was involved in subduing Armsden when he ran out of his cell, during which incident Armsden was allegedly pale, sweating, shaking, and yelling for someone to give him a drink (Davis Dep. at 28-31, 37; Doc. 267-14).   There is no evidence that Pulliam requested medical assistance for Armsden; instead, Mr. Davis testified that Pulliam threatened to "whip [his] fucking ass" if he did not shut up.   (Davis Dep. at 31).   The undersigned finds that this evidence is sufficient for a

reasonable juror to find that Pulliam was subjectively aware of Armsden's serious medical need, and that he was deliberately indifferent to that need.

### (e)  **Sgt. Jillian Bailey and Joe Raper**

The evidence shows that Sgt. Davenport told both Sgt. Bailey and Detention Officer Raper, who worked the day shifts on Saturday and Sunday, at the beginning of their shift on Saturday that Armsden had been brought in Friday night very intoxicated and had not been medically cleared, and that they "might need to call the nurse" because Armsden was "not acting right."  (C. Davenport Dep. at 63-64; Raper Dep. at 16-17).  Raper then observed on Saturday that Armsden was "freezing to death," in spite of being given three additional blankets, an observation he shared with Sgt. Bailey.  (Raper Dep. at 17-20).  Although Captain Newman instructed them to call the nurse, and allegedly Mason did so, the nurse did not come to examine Armsden.   Furthermore, neither Bailey nor Raper contacted the nurse directly or sought emergency medical care, in spite of the nurse's alleged belief that Armsden was having DTs, consistent with the information they had received about his intoxication and knowledge of his complaint that he was "freezing" in spite of having several blankets.  When Mason reported to Sgt. Bailey that Armsden could not eat solid food, she responded that he was "hung over drunk" and would be fine, thus indicating that she believed his symptoms were related to his alcohol consumption.  Raper noticed that by Sunday

afternoon, Armsden was just lying in his cell, not doing anything and not eating, observations that apparently so concerned him that he suggested to Sgt. Bailey that they call the EMTs about Armsden's condition.  (Raper Dep. at 31).  According to Raper, Bailey responded, "we better not because [Newman] would have a heart attack."  (*Id.* at 31).  As of the end of their shift on Sunday, no one had called the EMTs about Armsden, and the nurse had not come to see him.  (*Id.* at 30-32).

Similar to Sgt. Davenport and Officer Pulliam, the undersigned finds that there are issues of fact on whether Sgt. Bailey and Raper knew that Armsden had a serious medical need, acute alcohol withdrawal, that posed a substantial risk of serious harm if left unattended, and whether they "disregarded that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  Although they apparently believed his condition required medical care, as evidenced by their alleged efforts to contact the nurse and Raper's suggestion that they contact EMTs, they did not take steps to obtain prompt medical care to treat Armsden.  In light of the evidence of Armsden's serious medical needs known to Raper and Sgt. Bailey, the evidence that Armsden died from having no treatment for his alcohol withdrawal, and the underlying disputes concerning Defendants' reasons for their failure to obtain treatment (the nurse's alleged failure to come to the Jail, Sgt. Bailey's fear that Newman would "have a heart attack"), the undersigned finds that

there is sufficient evidence for a reasonable juror to find that Sgt. Bailey and Raper were deliberately indifferent to Armsden's serious medical needs.

### (f)  **Mitchell Mason**

Mason was a Detention Officer at the Jail Saturday and Sunday nights with Defendant Raper, under the supervision of Sgt. Bailey.   The evidence of his involvement with Armsden is as follows: Raper testified that he told Mason to call Captain Newman and heard Mason tell Captain Newman that Armsden "was freezing to death, he didn't know what was wrong with him."  (Raper Dep. at 18-20).   Raper assumes that Mason then called the nurse, and according to Raper, Mason reported that Mercer "said he's probably having DTs and there ain't much we can do about that," but she "would be over later to see [Armsden]."  (*Id.* at 20-21).   That afternoon, less than 24 hours after Armsden was brought to the Jail, Mason thought Armsden appeared "hung over" and asked for canned peaches because he could not eat solid food.  (Mason Dep. at 19).  Sgt. Bailey voiced her opinion to Mason that Armsden was "hung over drunk," but he would be "fine." (*Id.* at 19-20).   On Sunday, Mason allegedly called the nurse again at Raper's request because she had not come in the previous day (Raper Dep. at 29), but there is no evidence that Mason made any pertinent observations of Armsden or had any conversations with him on Sunday.  (*See* Mason Dep. at 22-23).   There is also no

evidence that anyone gave any information about Armsden from prior shifts on either Saturday or Sunday.  (*See id.* 15-21, 28).

The undersigned finds this evidence insufficient to show that Mason knew that Armsden had a serious medical need and that he failed to take reasonable steps to abate it.   All Mason allegedly knew or believed as of Saturday was that Armsden was "freezing," which lead Raper to voice the opinion that maybe he had the flu, and that Armsden was "hung over" and wanted softer food, such as peaches.  Although the nurse allegedly expressed her opinion that Armsden was having DTs, there is no evidence that Mason understood the seriousness of that condition or the need for immediate medical attention, particularly where the nurse allegedly stated there was not anything to do about it, and that she would be to the Jail later.  Even if Mason was grossly negligent in his failure to understand the significance of Armsden's symptoms, i.e., that he was in alcohol withdrawal as opposed to simply feeling the effects of his intoxication from the night before, that negligence is insufficient to establish that he was deliberately indifferent.

Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** on all of Plaintiff's federal claims against Defendant Mason.

### (g)  Sgt. Holly Phillips

Sgt. Phillips was the shift supervisor on Monday night, from 7 p.m. to 7 a.m. She does not remember being made aware of anyone's suspicions that Armsden

was having DTs, but at some point between 7 p.m. and 9 p.m., she tried to talk to Armsden, who appeared to Sgt. Phillips to be intoxicated, and unable to hold a conversation with her.  (Phillips Dep. at 27-28, 36).  She also observed that he was bleeding from a sore he was picking.  (*Id.* at 28-29).  Although she apparently did not call for the EMTs to come to the Jail in order to examine Armsden, once they were there, she did request that they see him.  (*See* Watkins Dep. at 17; Arp Dep. at 42-43).  The EMTs then observed Armsden in the same state Sgt. Phillips had observed him—unable to hold a conversation and bleeding from picking at a cut. In spite of those observations, the EMTs did not recommend that Armsden receive additional immediate treatment or be taken to the hospital at that time, provide any additional treatment other than cleaning his cut, or attempt to transport him themselves.  It was not deliberately indifferent for Sgt. Phillips to rely on the EMTs training, experience, observations, and professional judgment in determining that no additional measures needed to be taken to provide immediate medical care to Armsden.  *See, e.g.*, *Keith*, 749 F.3d at 1050 (""Simply put, the law does not require that Sheriff Brown ignore the determination and recommendation of MHM staff.  A sheriff cannot be held liable for failing to segregate mental health inmates whom trained medical personnel have concluded do not present a risk of harm to themselves or others.").

As discussed in more detail below, the EMTs allege that they were unable to appreciate the seriousness of Armsden's condition because no jailer provided them any information about Armsden's history at the jail, including his DUI arrest, intoxication upon being brought to the jail, suspected DTs, etc. But Plaintiff has not pointed to evidence that Sgt. Phillips, who did not come to work until Monday night, actually received that information. Thus, her purported failure to convey that information to the EMTs is not evidence of deliberate indifference. Furthermore, even if Sgt. Phillips had that information and failed to provide it to the EMTs, her failure constitutes gross negligence at most where the EMTs observed symptoms evidencing a serious medical need, but came to the conclusion that he did not require additional immediate medical attention.

Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** on all of Plaintiff's federal claims against Defendant Phillips.

### (h)  Earl Lamar Mashburn

There is no evidence that Defendant Mashburn, who worked as a Detention Officer during the Monday and Tuesday day shifts, had any relevant information about Armsden's condition when he began his shift on Monday. (*See* Mashburn Dep. at 10-13, 19-20). Furthermore, Mashburn testified that he "didn't see anything major" or out of the ordinary on Monday, when he helped move Armsden from his cell to the interview room and back, or when he took meals to him, such

66

as Armsden shaking, being fidgety, or smearing blood in his cell. (*See Id.* at 14, 18, 21; Doc. 267-26). Sgt. Verner testified that Armsden seemed "[a] little bit disoriented, confused, i.e., needed direction on which way to go, and unsteady on his feet." (Verner Dep. at 15-16, 18). The undersigned finds that those observations do not show that *Mashburn* made those same observations or actually drew the inference from them that Armsden had a serious medical need.

On Tuesday, however, the undersigned finds that Mashburn arguably subjectively believed that Armsden had a serious medical need when Mashburn arrived at the jail at 5:40 a.m. and learned that Armsden had been seen by EMTs the night before; that he continued picking on a sore on his face; that he had smeared blood on the walls of his cell, his bedding, and his clothes; and he was "acting different" and "talking about things that made no sense." (Mashburn Dep. at 21-22). The undersigned further finds that Mashburn then took "reasonable measures to abate" the substantial risk of serious harm if Armsden's medical needs were not treated. *Farmer*, 511 U.S. at 847. Chiefly, he called the EMTs back to the Jail, where they again treated Armsden's cut, took his vital signs, and helped Mashburn clean Armsden and move him to a new cell. (Mashburn Dep. at 22, 24, 26-28). The EMTs, who made the same observations of Armsden as Mashburn— picking at his cuts and smearing blood in his cell, being unsteady, and talking incoherently—did not then transport Armsden or even recommend that Armsden

be transported to a hospital for further treatment.  Even if Mashburn was negligent or grossly negligent in not pursuing additional medical care, the undersigned finds that the undisputed facts show that he was not deliberately indifferent.

Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** on all of Plaintiff's federal claims against Defendant Mashburn.

### (i) Sgt. Janella Verner

Sgt. Verner was the shift supervisor for the day shift on Monday from 7 a.m. to 7 p.m.  There is no evidence as to what the prior shift personnel told Sgt. Verner when she began her shift on Monday as to Armsden's condition, other than that he was "still intoxicated," and he was still in the holding cell.  (*See* Verner Dep. at 11-12, 19-20).  Sgt. Verner arranged for an officer to check on Armsden every 10 to 15 minutes, and she also checked on him, and she helped escort Armsden to an interview room to be interviewed about a burglary.  At that time, she observed that Armsden was pale, "[a] little bit disoriented," confused, e.g., "[l]ike a little kid needs direction on which way to go confused," and he was unsteady on his feet so Sgt. Verner held him by his arm.  (*Id.* at 15-16, 18).  Although she was aware of the signs of DTs, including shaking, mood swings, and sweating, he was not exhibiting those signs in her opinion.  (*Id.* at 20-22).  Mashburn testified that he did not see "anything major" or "out of the ordinary" in dealing with Armsden on Monday, suggesting that even if Armsden was experiencing alcohol withdrawal

that day, his symptoms were not so obvious as to put Sgt. Verner and Mashburn on notice of a serious medical need.  Given this evidence, the undersigned finds that as of Monday, Sgt. Verner was not aware that Armsden had a serious medical need that posed a substantial risk of serious harm if left untreated.

When Sgt. Verner returned to work on Tuesday morning at 6:40 a.m., the EMTs were there and treating Armsden, again, because he "kept picking sores." (Verner Dep. at 28-29; Doc. 267-21).  According to Sgt. Verner, the EMTs said that "Armsden probably needed to be somewhere where he could dry out," which she interpreted as meaning that he was suffering from withdrawal from "whatever he was on." (Verner Dep. at 29, 39).  She was not present when the EMTs were examining Armsden.  (*Id.* at 31).  The EMTs did not recommend that Armsden be transported immediately or indicate that he needed to have immediate medical attention beyond that which they provided.  The record shows that she continued observing Armsden after the EMTs left, at which time Armsden continued engaging in the same behavior that lead to the EMTs twice coming to the Jail, i.e., picking at his bandages and his skin, and Sgt. Verner reported the EMTs visits and statements to Captain Newman.  (*Id.* at 30-34).  Captain Newman decided to contact the nurse when the doctor's office opened at 9 a.m. (Newman Dep. at 33-34).  Sadly, Armsden died by 8:35, only an hour-and-a-half after the EMTs left the Jail and before the doctor's office opened.  The undersigned finds that Sgt. Verner

69

was not deliberately indifferent for not seeking additional immediate medical care after the EMTs left the Jail, particularly since the EMTs did not indicate that Armsden required immediate care or sought to transport Armsden to the hospital for additional treatment.  *See Keith*, 749 F.3d at 1050.

Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** to Defendant Verner on all of Plaintiff's federal claims.

### (j)  John Arp

Defendant Arp worked as a Detention Officer on Monday night from 5 p.m. to 11 p.m.  He was not given any information about Armsden's condition when he began working from prior shift personnel (Arp Dep. at 21-22), and his only involvement with Armsden occurred when he escorted the EMTs, at Sgt. Phillips' request, to see Armsden around 10 p.m. while they were at the Jail to see another inmate.   Arp had no information about Armsden's condition before he accompanied the EMTs to Armsden's cell; he had not spoken with Armsden, he had not observed him bleeding, and he had no information about Armsden possibly having DTs or trying to escape.  (*Id.* at 28, 52, 54).  Therefore, to the extent that he did not convey such information to the EMTs, the undersigned finds that failure does not constitute deliberate indifference.  When Arp went to Armsden's cell with the EMTs, he then learned the same information about Armsden that the EMTs did, i.e., that Armsden had smeared blood in his cell and on his clothing, he was

70

pale with a laceration on his face, he was unsteady and trembling, and he was talking about a tree limb hitting him in his cell, indicating a possible mental illness. (*Id.* at 32, 32, 40-41). The EMTs did nothing more at that point than clean Armsden's cuts and leave; they did not transport him to a hospital or indicate that he needed to be transported immediately. Under these circumstances, the undersigned finds that Arp was not deliberately indifferent by not taking additional steps to obtain medical treatment for Armsden, in light of the EMTs examination and apparent belief that Armsden did not require immediate care by a doctor or at a hospital.

Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** on all of Plaintiff's federal claims against Defendant Arp.

### (k)  Chad Ensley

The evidence shows that Chad Ensley worked at the Jail from April 9 to April 10, 2007, and that before Arp left that night at 11 p.m., he told Ensley "to keep an eye on" Armsden. (*See* Arp. Dep. at 52). The next morning Ensley told Mashburn that Armsden "had been picking on a sore on his face" and that EMTs had been there that night. (*Id.* at 21). That evidence does not indicate that Ensley knew that Armsden had a serious medical need, particularly in the absence of any evidence that Ensley was aware of Armsden's intoxication at the time of his arrest and other alcohol withdrawal symptoms observed by other Jailers.

Plaintiff has not pointed to testimony or other evidence that anyone informed Officer Ensley about Armsden's condition or that he personally observed anything that would have put him on notice about it; the only evidence is that he knew that Armsden had been picking on a sore and was bleeding.  None of the Jailers testified that they provided any other relevant information to Ensley, and Chad Ensley did not testify or make any statements that indicate he observed or knew about any symptom that would have put him on notice of Armsden's more serious condition.  Critically, there is not even circumstantial evidence that Ensley was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that he drew that inference. *McDaniels*, 405 Fed. Appx. at 458.

Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** on all of Plaintiff's federal claims against Defendant Ensley.

### (l)  EMTs (Epperson and Watkins)

Watkins and Epperson, both of whom were certified EMTs for Fannin County at the time, were called to the jail around 10:00 p.m. Monday April 9, 2007 to evaluate an inmate who was vomiting.  (Watkins Dep. at 16-17; Epperson Dep. at 18; Arp Dep. at 42).  After treating that inmate, Watkins and Epperson were led by Jail officer Arp to Armsden's cell so that they could address Armsden's facial bleeding.  (Arp Dep. at 42).  According to Arp, at that time, Armsden was pale,

unsteady and trembling, and "talking about a limb falling out of the tree and hitting his face, and as he spoke, he made it sound like the tree was in his cell." (*Id.* at 41).  Watkins testified that they were unable to gather a history of Armsden's illness or condition because Armsden "was not able to verbalize that," and that when they asked Armsden about the cut on his chin, "he told [them] that a tree limb had hit him." (Watkins Dep. at 21).  Epperson provided similar testimony: he stated Armsden could not say anything except "a tree limb had hit him." (Epperson Dep. at 26-27).  The EMTs patient care report indicates Armsden "did not know he was in jail," "would not be still," and continued to pick at the scratch on his face and wipe blood all over his cell.  (Doc. 267-24).

Watkins stated at his deposition that he asked the jailers (which specific jailers Watkins asked is not clear) for Armsden's history, but the jailers could not personally provide him with any information, other than to say that Armsden had "been acting like this since" he had been at the Jail.  (Watkins Dep. at 45).  Watkins admitted, however, that he and Epperson never asked the jailers what Armsden had been arrested for or if they could look at Armsden's booking records.  (*Id.*).  Watkins and Epperson did take Armsden's pulse and respiration, both of which were normal, but they were unable to check Armsden's blood pressure because he was too fidgety.  (*Id.* at 29).  Based on Armsden's vital signs, Watkins and Epperson did not see a need to immediately transport Armsden to the hospital.

73

(Epperson Dep. at 41-42; Watkins Dep. at 55).  According to Watkins, before he left the jail at around 10:30 p.m. Monday night, he recommended to one of the jailers that Armsden be seen for a psychological evaluation or seen by a doctor "because [Armsden] obviously was not in a lucid state of mind."  (Watkins Dep. at 31-32).  Arp, on the other hand, testified that the EMTs never stated what they believed Armsden's problem or condition was other than the possibility of a mental illness, and that the EMT's never told him personally that Armsden should be seen by a doctor or nurse or taken to a hospital or psychologist for evaluation. (Arp Dep. at 46).

At approximately 6:00 a.m. Tuesday April 10, 2007, Watkins and Epperson were again dispatched to the Jail to treat a "45-year old male bleeding from the face" i.e., Armsden.  (Watkins Dep. at 33).  When they arrived, Armsden still appeared to be disoriented – he continued talking about a tree limb hitting him in the face – and Watkins and Epperson noticed that Armsden had smeared his blood all over the jail cell.  (*Id.* at 36, 39).  Armsden was so "fidgety" and "active" that Watkins and Epperson were unable to slip the collar on his arm to take his blood pressure, but they did check Armsden's radials, which were strong.  (*Id.* at 37, 40; Doc. 278-1 at 6).  Watkins and Epperson had to help Armsden stand up because he was "unsteady," (Watkins Dep. at 37, 40), and they cleaned Armsden up, changed his clothes because his original clothing was too bloody, and moved Armsden to

another cell – Watkins and Epperson "stood on each side of [Armsden] just to steady him as he walked." (*Id.* at 39). Even though Armsden "was able to remove his shirt and slide out of his pants," Watkins and Epperson had to help Armsden put his new clothes on. (*Id.* at 39).

At around 6:40 a.m., Sgt. Verner arrived to work the 7:00 a.m. shift. (Doc. 267-21 at 1). Watkins and Epperson were still at the jail, and according to Sgt. Verner, they told her "that it looked to them like" Armsden was suffering from either drug or alcohol withdrawal, and that "[Armsden] probably needed to go somewhere and dry out." (Verner Dep. at 38-39). The EMTs, however, never informed Sgt. Verner that "it was imperative that [] Armsden receive additional medical attention in the very near future." (*Id.*).

Watkins testified at his deposition that he told a jailer on April 10, 2007, that Armsden should be seen by a psychologist or doctor, but it is not clear from the record which jailer Watkins spoke to. (Watkins Dep. at 31). Watkins and Epperson were authorized to transport an inmate to a hospital if they chose to do so, but they did not attempt to transport Armsden to the hospital nor did they recommend that Armsden be transported immediately for his medical issues. (Epperson Dep. at 73). Watkins and Epperson left the Jail around 7:00 a.m., at which time they observed Armsden laying on a mat and talking incoherently. (Watkins Dep. at 40).

The undersigned finds that this evidence, viewed in the light most favorable to Plaintiff, raises a genuine issue of fact on whether Watkins and Epperson subjectively knew that Armsden had a serious medical need and were deliberately indifferent to that need.  During their treatment of Armsden on April 9th and 10th, Watkins and Epperson, both certified EMTs, (1) noticed that Armsden was pale, unsteady, fidgety, disoriented, and unaware of the fact that he was in jail; (2) were unable to receive a medical history from Armsden because he "was not able to verbalize" it (Watkins Dep. at 21); (3) heard Armsden say, on more than one occasion, that even though he was inside a holding cell, a tree limb had fallen and hit his face; (4) had to help Armsden stand up, walk to another cell, and put new clothes on; and (5) observed that Armsden had picked a scab on his face and smeared blood all over his cell.   Based on their observations, Watkins and Epperson, according to Sgt. Verner's deposition testimony, concluded "that it looked to them like" Armsden was suffering from either drug or alcohol withdrawal, and that "[Armsden] probably needed to go somewhere and dry out." (Verner Dep. at 38-39).  This evidence is sufficient to create a genuine issue of fact as to whether Watkins and Epperson had actual knowledge of a serious risk of harm to Armsden if left untreated.  *See Harper*, 592 F.3d at 1234 (concluding that defendants had actual knowledge of a risk of serious harm where the defendants

knew that the plaintiff was "hallucinating, slurring his words, physically weak, and incoherent").

The record also raises an issue of fact on whether Watkins and Epperson were deliberately indifferent to Armsden's serious medical needs.  "When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."  *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)); *see also McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (same).  On this issue, Watkins and Epperson maintain that they provided adequate care by evaluating and treating Armsden's physical condition i.e., checking Armsden's vital signs and treating the cut on his face.  (Doc. 248-2 at 15).  Yet there is nothing in the record to indicate that the EMTs attempted to take steps to treat, or secure immediate medical attention for, Armsden's withdrawal symptoms – his unsteadiness, inability to stand up or put clothes on, disorientation, and other erratic behavior – even though, as Sgt. Verner's deposition testimony reveals, there is at least a genuine issue of fact on whether Watkins and Epperson understood Armsden's symptoms to be consistent with alcohol or drug withdrawal on Tuesday April 10, 2007.[21]  *See Harper*, 592 F.3d at 1234-1235 (concluding that

---

[21] Watkins and Epperson admit that Armsden was disoriented and not in a lucid state of mind, but nevertheless contend that they could not have known that the

the defendants were deliberately indifferent when they were aware that the plaintiff was "hallucinating, slurring his words, physically weak, and incoherent" yet did not "take any steps to actually secure immediate medical attention for the plaintiff, whose need for prompt treatment appeared dire").

Citing *Andujar v. Rodriguez*, 486 F.3d 1199 (11th Cir. 2007), Watkins and Epperson contend that they were not deliberately indifferent to Armsden's serious medical needs because they recommended to the jailers that Armsden be seen by a psychologist or doctor and assumed jail staff would make sure this happened. (Doc. 248-2 at 19). But *Andujar* is fundamentally different from the present case. There, the Eleventh Circuit found two paramedics were not deliberately indifferent to the plaintiff's dog-bite wounds because they cleaned and dressed the wounds, ensured the wounds stopped bleeding and the plaintiff's condition was stable, and then, assuming that the police would take the plaintiff to a medical facility for

---

mental state exhibited by Armsden was abnormal because they had not received any historical information about Armsden from the jailers i.e., the charges for which Armsden's was incarcerated, how long he had been at the jail, etc. (*See* Doc. 248-2 at 11-15). This argument, however, is not persuasive. In the first place, Sgt. Verner's testimony reveals that Watkins and Epperson appreciated the severity of Armsden's symptoms and concluded that Armsden may be suffering from withdrawal. (*See* Verner Dep. at 38-39). Moreover, although the record supports the EMTs contention that they received no historical information about Armsden from the jailers, the record also establishes that Watkins and Epperson *never once asked* the jailers what Armsden had been arrested for or if they could look at Armsden's booking records, which would have most likely alerted the EMTs as to what Armsden was charged for and how long he had been at the jail. (Watkins Dep. at 45).

further treatment, released the plaintiff to the police. *Andujar*, 486 F.3d 1199. Here, on the other hand, even though Watkins and Epperson believed Armsden's symptoms were consistent with alcohol or drug withdrawal, they did not effectively treat, much less stabilize, Armsden's withdrawal symptoms before leaving the jail on April 10, 2007 – indeed, the last thing they saw as they were leaving the Jail was Armsden laying on a mat talking incoherently. (*See* Watkins Dep. at 40). Moreover, there is no evidence that Watkins told the jailer on April 10, 2007, that Armsden needed to be seen *immediately*, even as Armsden's need for medical treatment appeared dire, and it is undisputed that the EMTs never recommended, or attempted, transporting Armsden to the hospital for his serious medical issues, even though they were authorized to do so. (Epperson Dep. at 73). Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Watkins and Epperson failed to take measures to reasonable abate the serious risks Armsden faced, and thus disregarded Armsden's serious medical needs. *See Farmer*, 511 U.S. at 847 (noting that the plaintiff must show that the defendant "disregard[ed] th[e] risk [of substantial harm] by failing to take reasonable measures to abate it"). Having concluded that Watkins and Epperson were deliberately indifferent to Armsden's serious medical needs, the undersigned **RECOMMENDS** that Watkins and Epperson's motion for summary judgment (Doc. 248) be **DENIED**.

**(m)** **Road Deputies (White and L. Davenport)**

At sometime between 9:00 p.m. and 10:00 p.m. on April 6, 2007, Deputy White arrested Armsden for DUI and brought him to the Fannin County Jail. (Doc. 267-8 at 1). Deputy White had to assist Armsden into the Jail because he was so intoxicated he could not walk a straight line. (Doc. 283 (hereinafter White Dep.) at 24). Sgt. Davenport was the Jail shift supervisor on duty when Armsden was brought in, and she asked Deputy White to take Armsden to the hospital to be medically cleared, but Deputy White refused. (C. Davenport Dep. at 28). Sgt. Davenport then called her husband, Deputy Davenport, and asked him to come to the jail. (Doc. 287 (hereinafter L. Davenport Dep.) at 21). Sgt. Davenport wanted to use her own car to drive Armsden to the hospital and to call the EMTs, but Deputy Davenport ordered her not to transport Armsden or call the EMTs – he "just figured [Armsden] was another DUI." (C. Davenport Dep. at 22-23, 29-30). Deputy Davenport did not observe or speak to Armsden, and he had no further involvement with him after he finished discussing the situation with Sgt. Davenport on April 6, 2007. (L. Davenport Dep. at 23, 27, 32-33).

At around 10:15 p.m., a State Patrol officer who had been summoned to the jail to perform an alcohol breath test arrived at the jail and called for the test to be done, but Armsden said he wanted ten minutes to sleep. (Doc. 267-6 at 3). When Deputy White again tried to get Armsden up, Armsden told him that he was sure

he would "blow illegal," so Deputy White and the State Patrol officer gave up trying to administer the alcohol breath test.  (White Dep. at 27-30).  Deputy White then left the Jail and went back on patrol until his shift ended at 7:00 a.m.  (*Id.* at 37).

Deputy Davenport worked from 7:00 p.m. Saturday night to 7:00 a.m. Sunday morning.  (L. Davenport Dep. at 33).  During his shift, he spoke to Sgt. Davenport, who was still concerned about Armsden receiving medical clearance.  (*Id.* at 34-35).  Deputy Davenport stated at his deposition that he does not remember Sgt. Davenport explaining to him why she felt Armsden should be medically evaluated, but when Sgt. Davenport asked him  "if [he] thought she ought to get the EMTs up there," they both "decided to have [the EMTs] come to the jail and check [Armsden]," but the EMTs were never called.  (*Id.* at 34).

At 3:30 a.m. on Monday morning April 9, 2007, Armsden ran out of his cell and into the booking room.  (Doc. 267-17 at 2).  Deputy White helped take Armsden back to his cell, and according to Sgt. Davenport, Armsden appeared disoriented at that time and continued to ask "where am I" and "why am I here." (*Id.*).

Even viewing this evidence in the light most favorable to Plaintiff, no reasonable juror could conclude that Deputies Davenport and White were subjectively aware of Armsden's alcohol withdrawal.  Turning first to Deputy

Davenport, Plaintiff attempts to establish subjective awareness by arguing that Deputy Davenport had actual knowledge "that Armsden had DT's and was behaving bizarrely," i.e., attempting to escape from jail. (Doc. 262 at 23). But the undersigned is not persuaded. First of all, there is no admissible record evidence[22] showing Deputy Davenport's actual knowledge of Armsden's DT's. To be sure, Sgt. Davenport did complain to Deputy Davenport about Armsden's lack of a medical evaluation, but there is no admissible evidence that she explained to Deputy Davenport why she believed Armsden should be medically cleared or, more specifically, that she believed Armsden was suffering from DT's. Nor is

---

[22] Plaintiff cites evidence of communications Deputy Davenport and Sgt. Davenport – who are and were married at the time of the communications – had about Armsden's condition that occurred in their vehicle traveling two and from work or in their home. (*See* Doc. 262 at 23). Specifically, Plaintiff cites Deputy Davenport's statement that Sgt. Davenport told him, while the two of them were in their home, that she suspected Armsden was suffering from DTs prior to the time he died. (L. Davenport Dep. at 40). In a February 26, 2011 Order, District Judge Richard W. Story concluded that communications between Sgt. Davenport and Deputy Davenport that occurred in their vehicle or home "fall within the parameters of the marital communications privilege." (Doc. 166 at 3-4). Plaintiff does not provide any arguments or authority to establish waiver of that privilege as to Deputy Davenport's statement about Sgt. Davenport's suspicion of DTs. (*See* Doc. 262 at 23). Thus, consistent with the February 26, 2011 Order, the undersigned finds that communication privileged and inadmissible at summary judgment. Even if the evidence was admissible, however, without further context, such as testimony about how Deputy Davenport responded to his wife's suspicions or when the statement was made, the undersigned cannot conclude that Deputy Davenport was deliberately indifferent to Armsden's serious medical needs, even if his wife's suspicions established his subjective awareness.

there any other evidence suggesting that Deputy Davenport had actual knowledge of Armsden's withdrawal symptoms i.e., Armsden's unsteadiness, inability to stand up or put clothes on, disorientation, and other erratic behavior. *Cf. Harper*, 592 F.3d at 1234 (concluding that defendants had actual knowledge of a risk of alcohol withdrawal where the defendants knew that the plaintiff was "hallucinating, slurring his words, physically weak, and incoherent"). As for Deputy Davenport's knowledge of Armsden's escape attempt, Plaintiff fails to explain – and the undersigned fails to see – how evidence of Armsden's escape attempt is sufficient to demonstrate Deputy Davenport's actual knowledge of Armsden's alcohol withdrawal.

As for Deputy White, the evidence Plaintiff provides against him presents a closer question, but it is still insufficient to raise a genuine issue of fact on subjective awareness. To establish awareness, Plaintiff principally relies on Davenport's April 9, 2007 Incident Report, written after Armsden had run out of his cell and into the booking room, in which she states that Deputy White, along with Pulliam, returned Armsden to his cell. (Doc. 267-17 at 1-2). From this report, Plaintiff infers that, since Deputy White was present during Armsden's escape attempt, he must have been aware that Armsden had been shouting, for at least two hours, "Please, I need a drink," and that Armsden had been pale and sweaty for quite some time. (Doc. 262 at 24-25). But critically, Plaintiff points to

no evidence to support that inference, and nothing in the record demonstrates how long Deputy White was at the jail, what symptoms of Armsden's he allegedly perceived, or what he heard Armsden say on April 9, 2007. (*See* Doc. 262 at 24-25).[23]  This lack of evidence is particularly significant given that Deputy White was a road deputy who was not permanently stationed at the jail during his shifts. (L. Davenport Dep. at 10-12).

This leaves Plaintiff with two pieces of evidence: (1) Deputy White's knowledge that Armsden was extremely intoxicated on April 6, 2007; and (2) Sgt. Davenport's statement that Armsden looked disoriented and stated "where am I?" and "why am I here?" while being returned to his cell following his apparent escape attempt.  (Doc. 262 at 25).  From this, Plaintiff appears to claim that, since Deputy White knew Armsden came into jail intoxicated on April 6, 2007, he should have realized Armsden was suffering from withdrawal when he later saw Armsden disoriented on April 9, 2007.  (Doc. 262 at 24-25).  But this argument is unpersuasive.  The context of Deputy White's encounter with Armsden on April 9, 2007 is critical.  Armsden ran out of his cell at approximately 3:30 in the morning, and, as Plaintiff admits, when Armsden was being captured, Roger Pulliam slammed his body into the wall, causing Armsden to bleed from his nose and

_____

[23] Although Deputy White was deposed, he did not testify about the incidents on April 9, 2007.

mouth.  (Doc. 262 at 25; L. Davenport Dep. at 38; Davis Dep. at 31-34).  Given this context – the early morning hours and the fact that Armsden had just been physically slammed against a wall – and the lack of evidence showing Deputy White's knowledge of Armsden's symptoms prior to the apparent escape attempt, it cannot be said that Armsden's alcohol withdrawal should have been so obvious to Deputy White based solely on Armsden's disorientation and confusing statements.  In any event, Sgt. Davenport's opinion that Armsden looked disoriented following his escape attempt says nothing about how *Deputy White* perceived Armsden's symptoms at that time.  Consequently, the undersigned concludes that Plaintiff has failed to establish subjective awareness.

Accordingly, because Plaintiff failed to establish Deputy White and Davenport's subjective awareness of Armsden's serious medical needs, the undersigned **RECOMMENDS** that the motion for summary judgment (Doc. 250) be **GRANTED** as to Deputies White and Davenport.

### iii.  Causation

Finally, Plaintiff must show that the alleged constitutional violation caused the injury.  *Cottone*, 326 F.3d at 1358.  Causation "can be shown by personal participation in the constitutional violation."  *Goebert*, 510 F.3d at 1327.  In light of the evidence discussed about each Defendant's involvement in the events leading to Armsden's death, the undersigned finds that there are genuine issues of

85

material fact as to whether the alleged deliberate indifference of Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins caused his death.

### iv.  Conclusion

Because Defendants George Ensley, Newman, Mason, Verner, Phillips, Mashburn, Arp, Chad Ensley, Larry Davenport, and White were not deliberately indifferent to Armsden's serious medical needs, it is **RECOMMENDED** that summary judgment be **GRANTED** to them on Plaintiff's § 1983 claims.

Because there is evidence that Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins were deliberately indifferent to Armsden's serious medical needs, the undersigned now turns to Defendants' arguments that they are protected from Plaintiff's § 1983 claims by qualified immunity.

### 2.  Qualified Immunity

### a.  Legal Standard

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The court applies a two-part analysis in determining whether qualified immunity protects a defendant:

86

1. The defendant public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.

2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions violated clearly established constitutional law.

*Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (internal quotations omitted). There are two parts to the question whether the defendant public official's actions violated clearly established constitutional law, and these questions need not be addressed in a particular order. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 813, 815-16, 818 (2009). On summary judgment, "a court must decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right" and "the court must [also] decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 815-16. "The burden rests on the plaintiff to show that qualified immunity is not appropriate." *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1327 (11th Cir. 2003). However, as is the general rule when a court considers a motion for summary judgment, the court must consider the facts in the light most favorable to the non-movant. *See Barnett v. Florence*, No. 09-16000, 2010 U.S. App. LEXIS 24670, at *10 (11th Cir. Dec. 1, 2010) (unpublished decision) (explaining that, in evaluating a qualified immunity claim on summary

judgment appeal, the facts "must be [construed] . . . in the light most favorable to the plaintiff").

"If a constitutional right would have been violated under the *plaintiff's* version of the facts, the court must then determine whether the right was clearly established." *Id.* (internal quotations omitted). A right is clearly established when it would be clear to a reasonable official that his conduct is unlawful under the circumstances. *Bashir v. Rockdale County*, 445 F.3d 1323, 1330 (11th Cir. 2006).

> This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. . . . The contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 1330-31 (citation and internal quotations omitted). In general, to determine whether a public official had "fair and clear notice" that his actions violated the Constitution, a court must examine "case law existing at the time of the violation"—"decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state"— involving facts "similar to the case at hand." *Id.* at 1331 & n.9. "In rare cases, 'the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.'" *Id.* at 1331 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th

Cir. 2002)).  And "while some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts, more often, the facts are so material to the violation at issue that such generalized principles are insufficient."  *Id.* (internal quotation omitted).

> While materially similar precedent or broad statements of principle can unquestionably establish a right with sufficient clarity to deny an officer qualified immunity, they are not in all instances required to provide officials with the requisite notice. . . . [T]here are some instances where the conduct in question goes so far beyond the hazy border of constitutionally permissible behavior that an official should be denied qualified immunity even absent materially similar precedent.

*Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N.D. Ga. 2005) (Story, J.) (citations and internal quotations omitted).

### b.  <u>Application</u>

It is undisputed that each Defendants' relevant conduct occurred within the scope of his or her authority and pursuant to his or her duties.  Furthermore, Defendants' decisions regarding the provision of medical care to Armsden "were arguably discretionary."  *Keele*, 938 F. Supp. 2d at 1305.  Furthermore, as discussed above, there is at least an issue of fact as to whether Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins acted with deliberate indifference to Armsden's serious medical needs.  Therefore, the determination of

qualified immunity turns on whether Plaintiff has shown that each Defendant violated Armsden's *clearly established* constitutional rights.

Relevant to that determination as to all Defendants, it was clearly established in this Circuit well before April 2007, when Armsden was incarcerated in Fannin County, that acute alcohol withdrawal is a serious medical need requiring immediate medical treatment. *See Harper*, 592 F.3d at 1235. In *Harper*, the court considered whether the district court correctly denied defendants' motion to dismiss the plaintiff's deliberate indifference claim—arising from the April 2007 incarceration and death, allegedly from untreated alcohol withdrawal, of an inmate—based on qualified immunity. *See id.* at 1230-31. In evaluating the "clearly established" element, the court found that the plaintiff had shown that the decedent's rights under the Fourteenth Amendment were clearly established at the time of his incarceration:

> In order to clear the qualified immunity hurdle . . ., Plaintiff must also show that [decedent's] rights under the Fourteenth Amendment were "clearly established" at the time they were allegedly violated [also in April 2007]. We find that Plaintiff can clear this hurdle. This Circuit has stated that its prior cases "established that a jail official who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights." *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1426 (11th Cir. 1997); *see also id.* ("Morrison clearly established that sheriffs and jailers cannot place or keep a chronic alcoholic in jail without any medical supervision, when the defendants are aware that the alcoholic is suffering from a severe form of alcohol withdrawal.") (citing *Morrison v. Washington County*, 700 F.2d 678 (11th Cir. 1983)).

90

*Id.* at 1235.

Defendants argue however that the *Harper* case, decided in 2010, "did not warn any officer in this case about clearly established law." (*See* Doc. 299 at 13 n.6). The court found, however, that prior to April 2007 (when the events in that case, as well as this case, took place), it was clearly "established that a jail official who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights." *Harper*, 592 F.3d at 1230-31. In making that finding, the court relied on Eleventh Circuit case law from 1983 and 1997, which clearly established the constitutional right at issue here.

Defendants also contend that *Harper* and the cases cited therein, i.e., *Lancaster* and *Morrison*, require that the jailers have actual knowledge that the prisoner is an alcoholic before liability can be imposed. (*See* Doc. 299 at 13). *Harper* mandates no such requirement. In *Harper*, the plaintiff alleged two ways defendants were aware of his serious medical needs: (1) they knew he was an alcoholic who would experience DTs based on prior arrests, and (2) they knew he had a serious medical need based on his conditions and symptoms at the jail. *Harper*, 592 F.3d at 1234. The Eleventh Circuit rejected the first theory because the plaintiff had not "offer[ed] any facts to suggest why *these* Defendants in particular (a sheriff, two jail adminstrators, and two jailers) would know of

Harper's specific medical history, nor did she offer any specific facts regarding Harper's past arrests." *Id.* The court did find that the plaintiff had sufficiently alleged that the jailers had "actual knowledge" of the risk of serious harm to Harper if left untreated based on their alleged observations or knowledge of Harper hallucinating, slurring his words, being physically weak and incoherent, displaying erratic and strange behavior, losing his balance, and urinating on himself. *Id.* Thus, in order to state a claim and avoid dismissal of her claims against the jailers on qualified immunity grounds, the plaintiff was *not* required to show that those jailers had "actual knowledge" that the inmate was an alcoholic. To the contrary, observing the conditions set out above gave the defendants who came in contact ample notice that he had a serious medical need. Under these circumstances, Defendants' contention that no liability can attach where they lack knowledge of Armsden's alcoholism is due to be rejected.

As extensively discussed above, there is evidence that each of these Defendants—Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins—violated Armsden's clearly established constitutional rights. There is evidence that each knew that Defendant had a serious medical need, i.e., was suffering from alcohol withdrawal, that left unattended, posed a substantial risk of serious harm. Furthermore, there is evidence that each "disregarded that risk by failing to take reasonable measures to abate it," *Farmer*, 511 U.S. at 847, and that as a result of

their failures, Armsden died.   Accordingly, the undersigned finds that these Defendants are not protected from Plaintiff's § 1983 claims by qualified immunity, and therefore **RECOMMENDS** that summary judgment be **DENIED** Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins on Plaintiff's § 1983 deliberate indifference and wrongful death claims.

### C.   <u>Punitive Damages</u>

In Count Two, Plaintiff seeks punitive damages under both federal and state law.   "In a § 1983 action, punitive damages are only available from government officials when they are sued in their individual capacities." *Young Apts., Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981)).   Because the undersigned has recommended that summary judgment be granted to Defendants George Ensley, Newman, Mason, Verner, Phillips, Mashburn, Arp, Chad Ensley, Larry Davenport, and White on Plaintiff's underlying § 1983 claims, it is further **RECOMMENDED** that summary judgment be **GRANTED** on Plaintiff's punitive damages claims against these Defendants.   *See Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1304 (11th Cir. 2009) ("A punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required").

As to Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins, Defendants argue that "there is no evidence that reaches the high level of culpability required for punitive damages, and because under federal law punitive damages do not survive Armsden's death." (*See, e.g.*, Doc. 250-8 at 17).  In *Smith v. Wade*, 461 U.S. 30, 56 (1983), the Court held that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *See Keele*, 938 F. Supp. 2d at 1307 (denying nurse's motion for summary judgment as to punitive damages where underlying deliberate indifference claim proceeded to trial). The undersigned finds that Plaintiff has presented sufficient evidence to defeat summary judgment on the issue of punitive damages and present that issue to a jury.  Furthermore, as it is at least an open question whether punitive damages are available from the individual Defendants, each of whom Plaintiff has sued in his or her individual capacity for Armsden's death (*see* Doc. 208), and whether damages are available for Armsden's alleged pain and suffering prior to his death, the damages issues raised by the parties are best deferred to a trial on Plaintiff's claims.  *See Yule v. Jones*, No. 1:04-cv-2462-WSD, 2010 U.S. Dist. LEXIS 24715, at *9 (N.D. Ga. Mar. 17, 2010) (deferring until trial the issue of whether decedent's estate was entitled to punitive damages).  Accordingly, it is **RECOMMENDED**

that summary judgment be **DENIED** to Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins on Plaintiff's punitive damages claims.

### D. <u>Attorney's Fees</u>

Count Four seeks attorney's fees and costs pursuant to 42 U.S.C. 1988 from all Defendants (excluding Gayle Mercer and GMHS). Because the undersigned has recommended that summary judgment be granted to Defendants George Ensley, Newman, Mason, Verner, Phillips, Mashburn, Arp, Chad Ensley, Larry Davenport, and White on Plaintiff's underlying § 1983 claims, it is further **RECOMMENDED** that summary judgment be **GRANTED** on Plaintiff's § 1988 attorney's fees claims against these Defendants.

Because the undersigned recommends that summary judgment be denied to Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins on Plaintiff's § 1983 claims, it is further **RECOMMENDED** that summary judgment be **DENIED** on Plaintiff's § 1988 attorney's fees claims against them.

### IV. <u>Plaintiff's State Law Claims</u>

In Count Three, Plaintiff alleges that all Defendants are liable for the wrongful death of Armsden under state law. In Count Five, Plaintiff alleges that the Fannin County Defendants, including former Sheriff Ensley, owed a duty to Armsden pursuant to O.C.G.A. § 42-5-2 to provide him with medical care, and as a result of their "negligence and gross negligence, Jason Armsden was deprived of

95

medical care . . . under O.C.G.A. § 42-5-2 and suffered lengthy and severe pain and suffering prior to his death."  (Doc. 208 at ¶ 101).  O.C.G.A. § 42-5-2 provides in part:

> (a) Except as provided in subsection (b) of this Code section, it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention; . . . .
>
> (b) (1) The officer in charge will provide an inmate access to medical services or hospital care . . . .

O.C.G.A. § 42-5-2.

## A.   Claims Against Fannin County And Defendants In Their Official Capacity

Defendant Fannin County and Sheriff Kirby argue that sovereign immunity protects them from Plaintiff's state law claims.  (*See* Doc. 250-5 at 6, 8-9).  The undersigned agrees.

As discussed above, Plaintiff's claims against Defendants in their official capacities are in reality claims against the County and are therefore superfluous. *See Keele*, 938 F. Supp. 2d at 1307-08 (explaining that suit against the sheriff was a suit against the county, which was also a defendant, and therefore superfluous). "In Georgia, a 'county is not liable for any cause of action unless made so by statute.' " *Id.* at 1308.  "Implied waivers of immunity are disfavored."  *Id.*  As explained in *Butler v. Carlisle*, 683 S.E.2d 882 (Ga. App. 2009):

The doctrine of sovereign immunity, which the Sheriff has raised as a defense, bars any claims against him in his official capacity.  Under the Georgia Constitution, as amended in 1991, sovereign immunity extends to the state and all of its departments and agencies.  The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.  *Sovereign immunity has been extended to counties and thus protects county employees who are sued in their official capacities, unless sovereign immunity has been waived.  Any waiver of sovereign immunity must be established by the party seeking to benefit from that waiver.*

*Id.* at 887 (concluding that because plaintiff "has not shown that an Act of the General Assembly specifically waived the sovereign immunity protecting the Sheriff[,] . . . the trial court did not err in granting summary judgment to the Sheriff as to any claims asserted against him in his official capacity" (footnotes and internal quotations omitted) (emphasis added)); *see also Seay v. Cleveland*, 508 S.E.2d 159, 161 (Ga. 1998) (plaintiffs' "claim against [Sheriff] in his official capacity for the negligent supervision of his deputies fails on sovereign immunity grounds," because "[a]lthough [he] might be held liable for negligent supervision had he been sued in his personal capacity, sovereign immunity acts as a bar to such claims against a sheriff in his official capacity unless sovereign immunity has been waived" (citation omitted)).  Plaintiff has offered no evidence of a waiver of the sovereign immunity protecting the County and Defendants in their official capacities.  Moreover, courts have held that the statute Plaintiff sues under, O.C.G.A. § 42-5-2, does not provide such a waiver.  *See, e.g.*, *Keele*, 938 F. Supp.

2d at 1308; *Gish v. Thomas*, 302 Ga. App. 691 S.E.2d 900, 908 (Ga. Ct. App. 2010).   Therefore, it is **RECOMMENDED** that summary judgment be **GRANTED** on Plaintiff's state law claims against Fannin County, Sheriff Kirby, and Defendants in their official capacities.

> **B.**     **Claims Against Defendants In Their Individual Capacities**

> > **1.**     **Claims Against Defendants George Ensley, Newman, Mason, Verner, Phillips, Mashburn, Arp, Chad Ensley, Larry Davenport, and White**

Because the undersigned has recommended that summary judgment be granted to Defendants George Ensley, Newman, Mason, Verner, Phillips, Mashburn, Arp, Chad Ensley, Larry Davenport, and White on Plaintiff's federal claims, it is further **RECOMMENDED** that the Court **DECLINE** to exercise its supplemental jurisdiction over any remaining state law claims against these Defendants, including her claim for punitive damages, and **DISMISS** those claims **without prejudice**.   *See, e.g.*, *Kimbell v. Clayton Cnty.*, No., 1:03-CV-2910-JEC, 2005 U.S. Dist. LEXIS 48698, at *72-92 (N.D. Ga. Sept. 27, 2005) (declining to exercise supplemental jurisdiction over state law claims as to some defendants where the court dismissed federal deliberate indifference claims as to those defendants, while denying summary judgment to other defendants on federal and state law claims), *aff'd*, 170 Fed. Appx. 663 (11th Cir. 2006).

> > **2.**     **Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins**

Defendants argue that official immunity bars Plaintiff's state law claims against them in their individual capacities. (*See, e.g.*, Doc. 250-7 at 18). "Official immunity protects public officers sued in individual capacities for misconduct in carrying out discretionary or ministerial activity." *Davis v. City of Atlanta*, No. 1:13-CV-2938-TWT, 2014 U.S. Dist. LEXIS 78277, at *13-14 (N.D. Ga. June 9, 2014). The Georgia Constitution provides, however, that a public officer:

> may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.

Ga. Const. Art. 1, § 2, ¶ IX(d). In *Cantrell v. Thurman*, 499 S.E.2d 416 (Ga. App. 1998), the court explained:

> A ministerial function has been defined as one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. Further, the term "official function" [has been] interpreted to mean any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts. Under [these] definitions, the 1991 amendment [to the Georgia Constitution] provides no immunity for ministerial acts negligently performed or for ministerial or discretionary acts performed with malice or an intent to injure.

*Id.* at 421 (citations and internal quotations omitted). Thus, "[u]nder Georgia law, a public officer or employee may be personally liable only for (1) ministerial acts negligently performed or (2) ministerial or discretionary acts performed with actual

malice or actual intent to cause injury." *Kimbell*, 2005 U.S. Dist. LEXIS 48698, at *69.

" 'A discretionary act . . . calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.' " *Keele*, 938 F. Supp. 2d at 1309 (quoting *Teston v. Collins*, 459 S.E.2d 452, 454 (Ga. Ct. App. 1995)).  "A ministerial act is 'simple, absolute, and definite.' "  *Id.* (quoting *Grammens v. Dollar*, 697 S.E.2d 775, 777-78 (Ga. 2010).  "It must be executed 'without any exercise of discretion.' " *Id.* (quoting *Grammens*, 697 S.E. 2d at 778). "Providing adequate medical attention for inmates under defendants' custody and control is a ministerial act by the sheriff and his or her deputies . . . because medical care is a fundamental right and is not discretionary . . . ." *Howard v. City of Columbus*, 521 S.E.2d 51, 66 (Ga. Ct. App. 1999).   "In contrast, the determination of what medical treatment to provide is an act of discretion subject to official immunity." *Id.*

The undersigned finds that Defendants Epperson and Watkins, the EMTs, were engaged in discretionary acts, not ministerial, when they twice treated Armsden for his injuries.  Their examination and treatment of Armsden "entail[ed] examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Keele*, 938 F. Supp. 2d at 1309.  "[T]he determination

of what medical treatment to provide is an act of discretion subject to official immunity." *Howard*, 521 S.E.2d at 66. Furthermore, there is no evidence that they acted with "actual malice." "[I]n the context of official immunity, actual malice requires a deliberate intention to do wrong, and denotes express malice or malice in fact. It does not include willful, wanton or reckless conduct or implied malice. Thus, actual malice does not include conduct exhibiting a reckless disregard for human life." *Daley v. Clark*, 638 S.E.2d 376, 386 (Ga. Ct. App. 2006) (footnotes and internal quotations omitted). Plaintiff has not pointed to evidence that Epperson and Watkins acted with "a deliberate intention to do wrong," even if they were negligent or grossly negligent in treating Armsden.

Accordingly, it is **RECOMMENDED** that summary judgment be **GRANTED** to Epperson and Watkins on Plaintiff's state law claims, including her claim for punitive damages.

The undersigned does not reach the same conclusion with respect to Defendants Carol Davenport, Pulliam, Bailey, and Raper. Carol Davenport and Pulliam, the officers present when Armsden was brought to the Jail, did not obtain medical clearance for Armsden, in spite of his extremely intoxicated state, and in apparent contravention of the Jail policy requiring such evaluation. It is uncontroverted that none of these four Defendants ever obtained medical treatment for Armsden, as discussed above, which arguably resulted in his death. Georgia

law provides that the provision of adequate medical care to inmates is a ministerial function. *Howard v. City of Columbus*, 521 S.E.2d at 66. Furthermore, there is evidence that these Defendants were more than negligent in performing their duties, as set forth in addressing Plaintiff's deliberate indifference claims. Thus, the undersigned finds that Defendants Carol Davenport, Pulliam, Bailey, and Raper are not protected from Plaintiff's state law claims by official immunity. Accordingly, it is **RECOMMENDED** that summary judgment be **DENIED** to these Defendants on Plaintiff's state law claims.[24]

### C.   Punite Damages

Plaintiff asserts a claim for punitive damages pursuant to state law. (Count Two). "Under O.C.G.A. § 51-12-5.1, punitive damages may be awarded to penalize, punish, or deter a defendant in such actions where a plaintiff proves by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care that would raise the presumption of conscious indifference to the consequences." *Willis v. Brassell*, 469 S.E.2d 733, 740 (Ga. Ct. App. 1996) (internal quotations

---

[24] Even if the undersigned found that these Defendants were engaged in discretionary acts, for the same reasons discussed in *Kimbell*, the undersigned would find that issues of fact exist on whether they acted with actual malice. *See Kimbell*, 2005 U.S. Dist. LEXIS 48698, at *73-91 (finding that certain jail officials were not entitled to official immunity because the court could not "say as a matter of law that defendant[s] did not intend to wrongfully delay or deny Kimbell needed access to medical care").

omitted).  Defendants correctly argue that under Georgia law, punitive damages are not available for a wrongful death claim.  (*See, e.g.*, Doc. 250-9 at 16); *see also Ortiz v. Wiwi*, No. 3:11-CV-00033, 2012 U.S. Dist. LEXIS 137881, at *7 (M.D. Ga. Sept. 26, 2012) ("[I]t is well settled under Georgia law that punitive damages are not available in a wrongful death claim" (quotation omitted)).  A decedent's estate may, however, recover punitive damages for his pre-death pain and suffering.  *See Folsom v. Kawasaki Motors Corp. USA*, 509 F. Supp. 2d 1364, 1381 (M.D. Ga. 2007) (explaining that, although punitive damages are not available in a wrongful death action under Georgia law, plaintiffs may recover punitive damages "if they can sustain a claim on behalf of their son's estate for their son's pain and suffering prior to his death"); *Hamby v. DaimlerChrysler Corp.*, No. 1:03-CV-0937, 2005 U.S. Dist. LEXIS 47619, at *29 (N.D. Ga. Dec. 5, 2005) ("As to the claim for punitive damages, under Georgia law, punitive damages are not available in a wrongful death claim, but the estate may recover punitive damages in connection with the injuries, pain, and suffering of the deceased.").

The undersigned finds that there are triable issues of fact on whether Armsden experienced pain and suffering prior to his death as a result of

Defendants' failure to provide medical treatment[25], and on whether their actions showed "willful misconduct, malice, fraud, wantonness, oppression or that entire want of care that would raise the presumption of conscious indifference to the consequences." *Willis*, 469 S.E.2d at 740.  Therefore, it is **RECOMMENDED** that summary judgment be **DENIED** to Defendants Carol Davenport, Pulliam, Bailey, and Raper on Plaintiff's state law punitive damages claims.

V.    <u>Conclusion</u>

Thus, **IT IS RECOMMENDED** that Defendants' motions for summary judgment (Docs. 248, 250) be **GRANTED in part and DENIED in part**.

Specifically, it is **RECOMMENDED** that summary judgment be **GRANTED** on Plaintiff's federal and state law claims, including punitive damages claims and attorney's fees, against Defendants Fannin County, Sheriff Kirby, and

---

[25] Defendants argue that Armsden did not experience pain and suffering, citing to the testimony of Plaintiff's expert, Dr. Byrd.  (*See, e.g.*, Doc. 250-9 at 21).  During his deposition, counsel asked Dr. Byrd, "Do any of the symptoms that you've listed, fidgetiness, nervousness, fever, delirium, agitation, combativeness, tachycardia, do any of those involve pain?" to which Dr. Byrd responded, "No, not unless it's self-inflicted."  (Byrd Dep. at 71).  When asked whether these symptoms involve suffering, Dr. Byrd replied, "That's hard to say.  That's a subjective thing."  (*Id.*).  He also explained that a person going through alcohol withdrawal is often "not lucid enough to tell you, I hurt here or . . . they don't know."  (*Id.*).  The undersigned finds that this testimony is insufficient to establish that Armsden did not experience pain and suffering as he suffered from untreated alcohol withdrawal for three days following his arrest, in light of all of the evidence discussed above concerning the symptoms he was exhibiting, including chills, sweating, shaking, inability to eat, and picking at his sores, as well as his injuries, including bleeding cuts and/or sores and bruising.

Defendants in their official capacities; Plaintiff's § 1983 claims against Defendants George Ensley, Newman, Mason, Verner, Mashburn, Phillips, Chad Ensley, Arp, Davenport, and White in their individual capacities; and Plaintiff's state law claims, including punitive damages claims, against Defendants Epperson and Watkins.  It is further **RECOMMENDED** that the Court **DECLINE** to exercise its supplemental jurisdiction over Plaintiff's state-law claims against Defendants George Ensley, Newman, Mason, Verner, Mashburn, Phillips, Chad Ensley, Arp, Davenport, and White in their individual capacities, including punitive damages claims, and those claims be **DISMISSED without prejudice**.

It is further **RECOMMENDED** that summary judgment be **DENIED** on Plaintiff's federal claims, including punitive damages and attorney's fees, against Defendants Carol Davenport, Pulliam, Bailey, Raper, Epperson, and Watkins in their individual capacities; and Plaintiff's state law claims, including punitive damages claims, against Defendants Carol Davenport, Pulliam, Bailey, and Raper.

**IT IS SO RECOMMENDED** this 15th day of August, 2014.

 /s/  J. CLAY FULLER
J. CLAY FULLER
United States Magistrate Judge